1         IN THE UNITED STATES DISTRICT COURT
        FOR THE CENTRAL DISTRICT OF ILLINOIS
2             SPRINGFIELD DIVISION

3  UNITED STATES OF AMERICA,   )
                      )
4          PLAINTIFF,   )  17-CR-30074
                      )
5       VS.       )  JURY TRIAL
                      )
6  WEST KINIOKI MPETSHI,    )  SPRINGFIELD, ILLINOIS
                      )
7       DEFENDANT.   )  VOLUME 10

8          TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SUE E. MYERSCOUGH
9        UNITED STATES DISTRICT JUDGE

10  AUGUST 16, 2019
    A P P E A R A N C E S:

11

12   FOR THE PLAINTIFF:   GREGORY K. HARRIS
                      PATRICK D. HANSEN
13                 ASST. U.S. ATTORNEYS
                      318 SOUTH SIXTH STREET
14                 SPRINGFIELD, ILLINOIS

15   INTERPRETERS:       ISABELLE FREEMAN
                      MYRIAM-ROSE KOHN
16

17   FOR THE DEFENDANT:   WILLIAM L. VIG
                      VIG LAW
18                 1100 SOUTH FIFTH STREET
                      2ND FLOOR
19                 SPRINGFIELD, ILLINOIS

20   INTERPRETERS:       ANGELA CHENUS
                      MARSHA CONROY

21

22

23   COURT REPORTER:     KATHY J. SULLIVAN, CSR, RPR, CRR
                      COURT REPORTER
24                 600 E. MONROE
                      SPRINGFIELD, ILLINOIS
25                 (217)492-4810

1                     I N D E X

2 WITNESS             DIRECT   CROSS   REDIRECT   RECROSS

3   GORDON AMEGBOH     1326    1330    1337     1344

4

5

6

7

8                  E X H I B I T S

9 GOVERNMENT'S EXHIBITS

10                             ADMITTED

11

12 DEFENDANT'S EXHIBIT
    NUMBER                         ADMITTED

13   Exhibit 47                    1331

14   Exhibit 48                    1332

15

16

17

18

19

20

21

22

23

24

25

                    P R O C E E D I N G S

          *    *    *    *    *    *    *    *    *    *    *

          (The following proceedings were held outside
          the presence of the jury.)

               THE COURT:  Please be seated.  Court is
reconvened outside the presence of the jury.

          Mr. Hansen, you have something?

               MR. HANSEN:  I do, Your Honor, if I may
address the Court.

          We have asked Special Agent Amegboh to return
this morning --

               THE COURT:  And thank you, sir.

               MR. HANSEN:  -- he has been kind enough to
do so.

          What we propose and what we think would be the
best course to follow would be for -- to ask the
Court if you would allow us to reopen our case and
recall Special Agent Amegboh to correct some of his
testimony of yesterday.

          He and I have had a chance to go through what's
the difference between the IRS policy and the
Cincinnati policy and the way it is practiced, and I
believe that there is some misapprehension that's on
the record that we would like to correct.

               THE COURT:  Mr. Vig?

1    MR. VIG:  Judge, in order to understand
2    whether it makes sense for me, on behalf of my
3    client, to oppose the motion to reopen the
4    Government's case, I would like to know what the
5    testimony is expected to consist of.
6    MR. HANSEN:  I expect it will consist of
7    Special Agent Amegboh saying that he was mistaken
8    that it is the IRS policy to never record a
9    statement.  That there are certain circumstances
10   understand which that can be done.  That there are
11   circumstances under which an affidavit may be taken.
12   None of those circumstances existed for him at the
13   time, and they chose not to do so.
14   THE COURT:  Mr. Vig?
15   MR. VIG:  May I consult with my client
16   briefly to make sure that he understands?
17   THE COURT:  Yes, you may.
18   MR. HANSEN:  And it may assist him in
19   communicating with his client; it is my intention,
20   if indeed the agent is impeached with the prior
21   inconsistent statement, to the extent that there is
22   even the hint or suggestion that the statement taken
23   from Mr. Mpetshi as testified to by Special Agent
24   yesterday is in any way fabricated or mistaken, that
25   the Government would move for admission of the rough

notes from Special Agent Amegboh under Federal Rule
of Evidence 801(d)(1)(B)(1) and (2).  Because I
believe that opens the door to make the prior
consistent statements very relevant.

THE COURT:  So have you shared those with
Mr. Vig?

MR. HANSEN:  He has the notes.

MR. VIG:  Those are the same notes that I
received during the early part of my cross of
Special Agent Goleman.  The other agent's notes were
also included in that production.

THE COURT:  Okay.

MR. VIG:  I'm sorry, Mr. Hansen, 801 --

MR. HANSEN:  (d)(1)(B), Subs 1 and 2.

The whole issue of whether this is recorded or
not I believe I said yesterday is collateral.  And
it is collateral.  But the issue of whether the
defendant's statement is -- is something that the
agent apparently is either mistaken about or just
making up is relevant.  That is the material fact,
whether it was recorded or not.  And if the
suggestion that it is not what the Special Agent
testified to, I believe opens the door.

MR. VIG:  Well, so I understand, the
Government's position is so far that door has not

been opened?

MR. HANSEN: So far I do not believe the door has been opened. But I do believe a suggestion on cross-examination of this witness that the statement is incorrect or in any way not the subject of what the defendant said, I think that door is opened.

MR. VIG: Your Honor, I understand we have a jury waiting. This -- I mean I learned of the Government's planned approach to this just now when the Court did. I understand I didn't get here until a few minutes before the Court did--I unfortunately had an 8:45 phone conference on whether I have a trial next week.

Because I just learned of it and because it is a somewhat complicated explanation involving law and facts that I think my client should understand prior to my taking a position on the Government's request to reopen its case, may I have five minutes or so with my client and one of the interpreters in one of the attorney conference rooms?

THE COURT: Yes, you may.

MR. VIG: Thank you, Judge.

THE COURT: Will you tell the jury that we're working on jury instructions and we'll with be

1    them in a few minutes.

2         Five minutes.  Court is in recess.

3         (A recess was taken.)

4              THE COURT:  Mr. Vig.

5              MR. VIG:  Your Honor, having discussed the

6    Government's motion with my client, we oppose a

7    motion to reopen the case.  We appreciate the

8    Government's desire to correct the testimony.  We

9    are prepared to do so though by calling the agent in

10   our case as we had previously planned.

11             MR. HANSEN:  It would be no prejudice to

12   allow the Government to reopen its case at this

13   point.  There's been no witnesses put on by the

14   defendant, there's been no positions taken by the

15   defendant that would be at all impacted by it.  It's

16   just a simple of correct the record.

17             THE COURT:  I'm going to allow the motion.

18        So may we have the jury?

19             MR. HANSEN:  You're going to allow the

20   motion to reopen?

21             THE COURT:  Yes.

22             MR. HANSEN:  Thank you.

23        Would you like me to do that in front of the

24   jury or simply to recall --

25             THE COURT:  Yes.

1    MR. HANSEN:  All right.

2    (The jury entered the courtroom.)

3    THE COURT:  Good morning, please be seated.

4    Court is reconvened.  Mr. Hansen.

5    MR. HANSEN:  Your Honor, the Government

6    requests this Court to reopen its case.  I realize

7    we rested yesterday, but there's something we would

8    like to clarify on the record.

9    THE COURT:  Mr. Vig, your position?

10    MR. VIG:  Your Honor, we object for reasons

11    previously stated.

12    THE COURT:  The objection is overruled.

13    Sir, you may take the stand, you're still under

14    oath.

15                    GORDON AMEGBOH

16    recalled as a witness herein, having been duly

17    sworn, was examined and testified as follows:

18                    DIRECT EXAMINATION

19    BY MR. HANSEN:

20    Q.  Once again, sir, could you state your full

21    name and spell your last name for the record.

22    A.  Gordon Amegboh, A-m-e-g-b-o-h.

23    Q.  All right.  And you testified here yesterday

24    as a Special Agent with the Internal Revenue

25    Service?

1    A. Correct.

2    Q. And you participated with Special Agent

3 Goleman in the interview of the defendant in this

4 case, Mr. West Mpetshi; is that correct?

5    A. That's right.

6    Q. Now, after you left yesterday, a question

7 arose--and I'd like to discuss that with you

8 now--regarding the IRS policy regarding recording

9 statements or affidavits.

10    Since yesterday, have you had the opportunity

11 to review the IRS manual and speak with your Special

12 Agent In Charge or -- I don't know what they call

13 them in Cincinnati, but speak with your supervisor

14 about what the policy is?

15    A. Yes, I have.

16    Q. All right. Was your testimony yesterday

17 correct?

18    A. Yes, it was.

19    Q. All right. Was it complete?

20    A. No, it was not.

21    Q. All right. Can you -- are there

22 circumstances under IRS policy where a recording can

23 be made of the interview of a subject?

24    A. Yes, there are.

25    Q. So it is not prohibited under the IRS

1    Criminal Investigation Division?

2        A.  It is not.

3        Q.  Is that the practice in Cincinnati?

4        A.  To record?

5        Q.  To record?

6        A.  It is not the practice.

7        Q.  In the ten years you've been there has it

8    ever been the practice during that period of time to

9    record interviews?

10       A.  Never.

11       Q.  During your ten years of experience, how

12   many interviews have you recorded?

13       A.  None.

14       Q.  And have you also had the opportunity to

15   review the IRS policy regarding affidavits or

16   written statements?

17       A.  I have.

18       Q.  All right.  And yesterday I recall you

19   saying that IRS policy was not to take a written

20   statement.  Have you -- would you like to expound on

21   that?

22       A.  Sure.  There is an opportunity for a

23   defendant to provide a written statement.  However,

24   that is one of four options for taking testimony

25   from a witness or a subject.  Since I've been a

special agent, we have only taken informal notes and
subsequently memorialized it with a memorandum of
interview.  I have never had a witness or subject
complete an affidavit.

Q.  All right.  Is it or was it your
understanding or -- bad choice of words.

Were you speaking of your protocol rather than
broadly IRS CID policy nationwide?

A.  That's correct.

Q.  And your understanding of the protocol in
the Cincinnati Division is what regarding
affidavits?

A.  It's that special agents take notes.  We do
not provide affidavits to witnesses or subjects when
conducting interviews.

Q.  But again, it's not prohibited?

A.  Correct; it's not prohibited.

Q.  And in fact, there's a form that can be used
for that in appropriate circumstances?

A.  Correct.

Q.  Do you believe your interview with
Mr. Mpetshi was an appropriate circumstance?

MR. VIG:  Objection; foundation.

THE COURT:  The objection is overruled.

A.  Will you repeat the question?

1    Q.  Did you -- from your experience and in

2  working with Special Agent Goleman, did you believe

3  that your interview with Mr. Mpetshi called for the

4  submission of an affidavit or the writing of an

5  affidavit by --

6    A.  No, I did not.

7    Q.  -- the witness or by the subject in this

8  case?

9    A.  No, it did not.

10   Q.  When you conducted the interview, did you

11 take notes?

12   A.  Yes, I did.

13   Q.  And did you testify yesterday after

14 reviewing those notes?

15   A.  Yes, I did.

16   Q.  If I may have just one minute, Your Honor.

17       THE COURT:  Yes, you may.

18       MR. HANSEN:  We have no other questions.

19 Thank you very much, Your Honor, for your patience.

20       THE COURT:  Cross, Mr. Vig?

21       MR. VIG:  Your Honor, thank you.

22            CROSS EXAMINATION

23 BY MR. VIG:

24   Q.  Agent, I'm going to hand you two documents

25 which I have labeled Defendant's Exhibits 47 and 48.

1    Is Exhibit 47 the portion of the Internal

2    Revenue manual which you reviewed yourself and

3    discussed with your supervisor since your testimony

4    yesterday?

5         A.  A portion of it; yes.

6         Q.  Okay.  And the particular portion I've

7    handed you is a portion which pertains specifically

8    to interviews and IRS criminal investigations?

9         A.  Correct.

10        Q.  Your Honor, I move to admit Exhibit 47.

11            THE COURT:  Any objection?

12            MR. HANSEN:  I object to relevance, Your

13   Honor.  This is a completely collateral matter.

14            THE COURT:  The objection is overruled.  It

15   will be admitted.  Defendant's 47.

16        Q.  Thank you, Your Honor.

17        (Defendant's Exhibit 47 was admitted.)

18        Q.  Is Exhibit 48 the form that the prosecutor

19   just questioned you about on direct allowing you to

20   take written statements?

21        A.  This is the affidavit form; yes.

22        Q.  Okay.  As it appears in the Internal Revenue

23   manual?

24        A.  I believe so; yes.

25        Q.  Okay.  Your Honor, I move to admit

defendant's 48.

THE COURT:  Any objection?

MR. HANSEN:  Same objection; relevance.

THE COURT:  The objection is overruled.
Defendant's 48 is admitted.

(Defendant's Exhibit 48 was admitted.)

Q.  Agent, I believe you just testified that
your testimony was correct, but it was not complete?

A.  Correct.

Q.  It was the truth, but not the whole truth?

A.  No, it was incomplete in the sense that I
was mistaken with regards to all of the options that
were available.  It's -- it was the truth, but not
complete, because I did not understand that there
were other options available for a witness -- or to
record another witness -- a witness's testimony.

Q.  You've been with IRS for 13 years?

A.  Correct.

Q.  Been a criminal investigator for ten years?

A.  Correct.

Q.  Is last night or this morning the first time
you have seen this portion of the manual?

A.  Yes.

Q.  You've never had occasion in 13 years to
read the portion of the manual that governs

1   interviews in criminal investigations?

2       A.  That's right.

3       Q.  This Cincinnati practice.  Is it written?

4       A.  Not to the best of my knowledge.

5       Q.  You learned about it through the customs

6   that were in place when you came to Cincinnati?

7       A.  In the Cincinnati field office.  I had

8   never --

9       Q.  Well, my question is not what you've

10  done--which has already been established--but how

11  did you first learn about the practice?

12      A.  About what practice?

13      Q.  The practice of never recording or asking

14  for a written statement?

15      A.  By my experience and training.  I didn't

16  learn that in training and I didn't learn it in the

17  field.

18      Q.  Your Honor, may I have just a moment,

19  please?

20          THE COURT:  Yes, you may.

21          MR. VIG:  I have no further questions of

22  this witness, Your Honor.

23          THE COURT:  Thank you, Mr. Vig.

24      Mr. Hansen.

25          MR. HANSEN:  No additional questions.

1       And again, I thank you for your courtesy in

2   allowing me to clear that up.

3           THE COURT:  Does the jury have any

4   questions?

5       (The following sidebar discussion was held at

6       The bench, out of the hearing of the jury.)

7           MR. CHENUS:  Sorry, gentlemen.  I need

8       to move.

9           THE COURT:  Jury question 18.  Two

10      parts.

11      First part:  What would be cause for using

12      a written statement in an interview?

13      Part two:  You said there was lot of four

14      options -- one of four options is an

15      interview.  What are the four options?

16          MR. VIG:  They're both fair questions.

17          MR. HANSEN:  I'm fine with them; yeah.

18          THE COURT:  I'm sorry?

19          MR. HANSEN:  I'm okay.  I have no

20      objection to it.

21          THE COURT:  Okay.

22      (The following proceedings were held in open

23      court.)

24          THE COURT:  Jury Question 18.  Two parts.

25      1.  What would be cause for using a written

1   statement in an interview?

2           THE WITNESS:  I don't know if there's a

3   real reason.  There are four options for

4   memorializing a statement provided by a witness or a

5   subject.  One of the ways that they can -- that we

6   can take their testimony is by affidavit.  That's

7   one of the ways it can be done.  In Cincinnati, my

8   practice, my experience, we've always taken notes.

9   We ask questions and they provide answers.  So --

10  and we write statements.  I mean write notes.

11          THE COURT:  Second part:  You said there

12  was one of four options in an interview.  What are

13  the four options.

14          THE WITNESS:  There's an affidavit, a

15  statement, a question and answer statement, and then

16  notes.  So the notes is what Special Agent Goleman

17  and I did.  We asked questions and took notes.

18      An affidavit would be the witness writing out

19  their own words.  And then a statement would be

20  similar to an affidavit, but just a statement

21  provided by the witness or the subject.  And the

22  question and answer statement would be where

23  questions are written down and then answers

24  provided.

25          THE COURT:  Any follow-up, Mr. Hansen?

1    MR. HANSEN:  No, Your Honor.  Thank you.

2    THE COURT:  Mr. Vig?

3    MR. VIG:  Briefly, Judge.

4                    RECROSS EXAMINATION

5    BY MR. VIG:

6    Q.  Affidavits would be the written statement

7    under oath.  And a statement would be a written

8    statement not under oath?

9    A.  I believe so.  Correct.

10   Q.  Question and answer is a verbatim record of

11   the questions you asked and the answers that are

12   given?  It's taken either by a stenographer or an

13   electronic recording device?

14   A.  Correct.

15   Q.  That could be done under oath as well

16   because one of your powers as special agent is the

17   authority to administer oaths?

18   A.  I'm not aware of that authority.  I was not

19   taught to administer oaths to witnesses or subjects.

20   Q.  Oh, okay.  Fair enough.

21       The first jury question was what would be cause

22   for using a written statement in an interview.  And

23   I believe would it be fair to characterize your

24   statement as you don't know because you've never

25   done it?

1    A.  That's fair.

2    Q.  Okay.  So when, previously, Mr. Hansen asked

3  you whether the circumstances here called for a

4  written statement, you don't know what circumstances

5  call for a written statement because you've never

6  had occasion to do it?

7    A.  In this instance, we chose to take formal

8  notes.

9    Q.  As in every instance you've been involved

10 in?

11   A.  Correct.

12   Q.  But this is your first instance in the

13 Springfield Office?

14   A.  Correct.

15   Q.  No further questions.

16      THE COURT:  Anything further, Mr. Hansen?

17                REDIRECT EXAMINATION

18 BY MR. HANSEN:

19   Q.  Special Agent Amegboh, were you writing your

20 notes as West Mpetshi was speaking?

21   A.  Yes.

22      MR. HANSEN:  I have no other questions.

23      THE COURT:  Does the jury have any

24 questions?

25   (The following sidebar discussion was held at

1    the bench, out of the hearing of the jury.)

2         THE COURT:  Jury question 20.  Is an

3    affidavit or other recording--verbal or

4    written--of a defendant's interview

5    mandatory or merely an option?

6         MR. HANSEN:  Fair question.

7         MR. VIG:  I think he's already

8    testified he now knows it's an option.

9         THE COURT:  So no objection?

10        MR. VIG:  No objection.

11        THE COURT:  So I'm going to go ahead

12   and do all of these before I ask him.

13   So Jury Question 21:  Are all four ways of

14   getting testimony of the defendant equal in

15   the eyes of the IRS and laws in order to

16   prosecute?

17        MR. VIG:  That's not -- I think that

18   we agree we know several reasons it's not a

19   good question.  Or no?  If you don't agree,

20   I can enumerate them.

21        MR. HANSEN:  I think it's an

22   appropriate question.

23        THE COURT:  So the eyes of the law is

24   not appropriate question?

25        MR. VIG:  The eyes of the law, I don't

know if -- no.  He doesn't have a law

degree, he's not a lawyer, and he's not

here to talk about what the eyes of the law

are.  It impinges upon the province of the

jury.  And also has no idea only because he

was only ever aware of one until sometime

between yesterday afternoon and this

morning.

THE COURT:  I'm going to ask 21 over

objection.

Jury question 22:  Does the manual change

year by year?

MR. HANSEN:  This one actually changed

in 2014, when the DOJ policy changed

allowing written -- or allowing recorded

statements.  Prior to that, it was the

policy of DOJ not to record interviews

period.

THE COURT:  So no objection?

MR. HANSEN:  So I would have no

objection.  I just don't know if this

witness knows.

MR. VIG:  Your Honor, can you restate

the question, please?

THE COURT:  Does the manual change

1    year by year?

2        MR. VIG:  Perhaps if the -- if the

3    question is rephrased to -- I mean the

4    manual has its current effective date

5    printed at the beginning of it.  I mean

6    since the guy doesn't necessarily read the

7    manual, it's not a good question to ask of

8    him how often something changed.

9        THE COURT:  I'm going to ask 22 over

10   objection.

11   Jury question 23:  In the legal setting,

12   would one option suggest notes or a written

13   statement have more or less validity than

14   another?  If so, which option has the most

15   validity.

16   Mr. Hansen?

17       MR. HANSEN:  Again, I think that's an

18   inappropriate question in a legal setting.

19   It's the case where there's a written

20   statement, they'll ask for a recording.  If

21   there's a recording, they'll ask for a

22   video recording.  So they're all the same.

23       THE COURT:  I have to point out to the

24   translator, the reason I don't allow you to

25   translate -- no offense to my Court

 1    Reporter, she makes mistakes, and sometimes

 2    there is a lapse when it was typed and

 3    sometimes she makes corrections when doing

 4    it.  That's why I have you up here to

 5    translate what's being said.

 6    So if you can't hear, make sure you come

 7    over here.  Thank you.

 8    Mr. Vig.

 9        MR. VIG:  Your Honor, can you please

10    re-read the question?

11        THE COURT:  In the legal setting, does

12    one option--such as notes or written

13    statement--have more or less validity than

14    another?  If so, which option has the most

15    validity?

16        MR. VIG:  Not an appropriate question

17    for this witness.  He's not a lawyer, he's

18    not being called on to instruct the jury as

19    to the law.  There's ample opportunity to

20    instruct the jury as to the law.  This is

21    not a -- his being asked to say simply,

22    "Oh, I think it's always better because

23    it's what I do," is just giving him an

24    opportunity to try to support his own

25    testimony with things outside his

1  knowledge.

2      THE COURT:  I think this witness has

3  been very honest.  I doubt he's going to

4  make things up.

5  Mr. Hansen, your position?

6      MR. HANSEN:  I agree, I don't think

7  he's going to make things up.  But it is a

8  legal question, does one have more validity

9  than the other.

10     THE COURT:  Well, it's not a legal

11  question.

12     MR. HARRIS:  It's almost a question

13  that the jury should determine.  The weight

14  of the methodology used.  That is, it seems

15  to me, their purview.

16     THE COURT:  So it seems to you --

17     MR. HARRIS:  It should not be asked.

18     THE COURT:  Then I will not ask it.

19  And I will explain that one of the

20  questions was a legal question and we will

21  instruct them on the law.

22  I suspect you will have follow-up questions

23  after I ask these.

24     MR. HANSEN:  I believe that to be the

25  case; yes.

1    THE COURT:  Okay.

2    (The following proceedings were held in open

3    court.)

4    THE COURT:  I have a number of questions

5    for you.

6    Jury Question 20.  Is an affidavit or other

7    recording--verbal or written--of a defendant's

8    interview mandatory or merely an option?

9    THE WITNESS:  It is mandatory that we

10   memorialize the witness's or subject's statements in

11   one of the four forms.  Usually one of the four

12   forms, affidavit, statement, question and answer

13   statement, or formal notes.

14   THE COURT:  Jury Question 21.  Are all four

15   ways of getting testimony of the defendant equal in

16   the eyes of the IRS or laws in order to prosecute?

17   THE WITNESS:  I believe so.  It says in the

18   record of interview you need to take one of the four

19   forms.  It doesn't specify which is more valid or --

20   they don't -- I think they all hold the same weight.

21   There's no -- it doesn't specify which is more valid

22   in the eyes of the law.

23   THE COURT:  Okay.  Jury Question 22.  Does

24   the manual change year by year?

25   THE WITNESS:  I do not know the answer to

that question.

THE COURT: Okay. And Jury Question 23 is not going to be asked. It is a legal question and I will instruct the jury on the law at the close of the evidence.

Any follow-up questions, Mr. Hansen?

MR. HANSEN: We will refrain from asking follow-up questions. Thank you.

THE COURT: Mr. Vig.

MR. VIG: Briefly, Judge.

RECROSS EXAMINATION

BY MR. VIG:

Q. Sir, you're not a lawyer; correct?

A. Correct.

Q. And what you can do is tell us what you've been trained on and what's in the IRS manual; correct?

A. Correct.

Q. Now, the other three formats you testified about--written statement, affidavit, and question and answer statement--all contain the opportunity for the person whose statement is taken to review the statement and sign off on it; correct?

A. Correct.

Q. The fourth option, the notes, that option is

1    not -- doesn't exist there; correct?

2        A.  Correct.

3        Q.  No further questions.

4            THE COURT:  Mr. Hansen?

5                    REDIRECT EXAMINATION

6    BY MR. HANSEN:

7        Q.  Did you take notes?

8        A.  Yes.

9        Q.  Did Special Agent Goleman take notes?

10       A.  Yes.

11       Q.  Were those notes contemporaneous, meaning at

12   the same time --

13           MR. VIG:  Asked and answered.

14       A.  Yes.

15           THE COURT:  The objection is overruled.

16       Q.  Did you testify consistently with your

17   recollection as refreshed my the notes?

18       A.  Yes, I did.

19           MR. HANSEN:  I have no additional

20   questions.

21           THE COURT:  Thank you, Mr. Hansen.

22       Mr. Vig?

23           MR. VIG:  No further questions, Judge.

24           THE COURT:  Does the jury have any further

25   questions of this witness?

1    No?

2    Sir, you're excused.

3    (The witness was excused.)

4         MR. HANSEN:  At this time, Your Honor, the

5    United States rests.

6         THE COURT:  All right.  Mr. Vig?

7         MR. VIG:  Your Honor, may we approach at

8    this time?

9         THE COURT:  Yes, you may.

10        (The following sidebar discussion was held at

11        the bench, out of the hearing of the jury.)

12        MR. VIG:  I need to make a Rule 29

13        motion.  I think I need to do it outside

14        the presence of the jury.  Do you want me

15        to do it right here?

16        THE COURT:  No.  We'll take them out.

17        (The following proceedings were held in open

18        court.)

19        THE COURT:  We have some legal matters to

20   take care of.  We're going to complete the jury

21   instructions that we're going to give to you.  We'll

22   give you about -- I think we can get it done in

23   20 minutes.

24        So, Joe, if you'll take the jury out.

25        (The jury left the courtroom.)

1    THE COURT:  Please be seated.

2    MR. HANSEN:  Just so I'm sure, Your

3  Honor -- I'm sorry.

4    THE COURT:  The door is now closed.

5    MR. HANSEN:  Are we okay with letting

6  Special Agent Amegboh go back to Cincinnati.

7    THE COURT:  Mr. Vig?

8    MR. VIG:  Yes, Judge.

9    THE COURT:  Mr. Amegboh, I just have a

10  question:  How far did you get yesterday?

11    THE WITNESS:  About an hour and a half.

12    THE COURT:  Thank you very much for turning

13  around.

14    All right, your motion.

15    MR. VIG:  Your Honor, outside the presence

16  of the jury, I have a motion for judgment of

17  acquittal at the close of Government's evidence.

18    The Court has obviously heard all the evidence,

19  would you like argument or just rule?

20    THE COURT:  Well, if you wish to argue, you

21  may.

22    MR. VIG:  Okay.  Very good.

23    Your Honor, briefly, the argument is, as to

24  Counts 1 and 2, obviously, the evidence consists of

25  the tax returns that have been admitted and the

testimony as to my client's statements, which we've now learned could have been recorded but weren't because that's not the practice at least in Cincinnati.

As to Counts 3 through 30, the evidence rests in heavy part on the testimony of the so-called taxpayers who've been called by the Government; each of whom has testified they had no idea what was going on, and each of whom has had prior or subsequent problems or both with phony-looking taxes. I apologize for not having a better way to characterize that.

But that's the substance, in short, of my motion for judgment of acquittal as to all counts.

THE COURT: Okay. Thank you very much.

The motion is denied.

Then will your client be testifying, Mr. Vig?

MR. VIG: Your Honor, my client will be exercising his right to remain silent.

THE COURT: All right. Mr. Mpetshi, we have to talk about this.

You have the right to testify here today. You have the right not to testify. If you decide to testify, Mr. Harris and Mr. Hansen will be able to cross-examine you on behalf of the Government.

1    If you decide not to testify pursuant to the

2 Fifth Amendment of the United States Constitution,

3 no adverse inference can be taken from that

4 decision.  The jury may not, in any way, consider

5 the decision not to testify and will be so

6 instructed.

7    Now, do you understand you have an absolute

8 right to testify here at trial?

9         THE DEFENDANT:  Yes.

10         THE COURT:  Have you discussed this matter

11 with Mr. Vig?

12         THE DEFENDANT:  Yes, we spoke about this

13 with Mr. Vig.

14         THE COURT:  Do you want to discuss your

15 decision privately with Mr. Vig now?

16         THE DEFENDANT:  I believe I've had ample

17 opportunity.  We've discussed it several times with

18 Mr. Vig, my attorney.  I believe I've made my

19 decision and I don't think there's anything left to

20 add to that discussion.

21         THE COURT:  All right.  What is your

22 decision?  Do you wish to testify or not to testify

23 in this case?

24         THE DEFENDANT:  I think that after three

25 years of this investigation, along with two years of

probation, I think that I have been able to tell

everything I wanted to tell. I've cooperated with

Special Agent Cory.

What I wanted was a jury trial and to have a

jury make the decision. I believe everything has

been said and I do not wish to testify.

THE COURT: Has anyone threatened you or

forced you to say you do not want to testify?

THE DEFENDANT: No, no one pushed me not to

testify. For three years I've been following this.

What I wanted was a trial with a jury. You

accorded -- you granted me that. And I believe that

it's been a just and fair trial. Thank you for

that.

And I -- excuse me, the interpreter is going to

request a repeat of the last sentence.

When I had anything that I was concerned about,

I said it loud and clear. And no, no one has pushed

me to make my decision either way, it is entirely my

own decision.

THE COURT: Has anyone promised you any

benefit if you would say that you won't testify?

THE DEFENDANT: No, no one pushed me in any

way to make this decision. I have my head on my

shoulders, I know how to think about the things that

have presented themselves.

The thing that I wanted very much, absolutely, is to have a trial with a jury. And throughout this entire procedure, this whole trial, I've had nothing to complain of. Everything has been done justly and fairly. No promises have been made. This decision has been entirely my own.

THE COURT: Have you made the decision yourself after weighing your options and discussing them with your lawyer?

THE DEFENDANT: This was my initial decision at the beginning of all this. For the past three years, my family and I have been going through all of this. When I left, I told my wife that I would go, but that I would say nothing. What I wanted really was to see the witnesses, look them in the eyes as they made the statements that they were going to make. I had never planned on saying a word. I wanted to watch them and see what they were going to say right in front of me.

THE COURT: Counsel, do you want me to make any further inquiry at this time?

MR. VIG: No, Your Honor, thank you. I'm satisfied with this Court's inquiry.

MR. HARRIS: No, Your Honor. Thank you

1    very much.

2         THE COURT:  Court finds defendant

3    understands his right to testify and has knowingly

4    and voluntarily chosen not to testify.

5         Will defendant be presenting any evidence

6    today?

7              MR. VIG:  No, Your Honor.

8              THE COURT:  So, Mr. Mpetshi, your lawyer is

9    telling me there will be no evidence presented on

10   your behalf.  Do you understand that?

11             THE DEFENDANT:  Yes, I understand that.  I

12   understand all of these things.  I have no

13   complaints and I have no worries on the subject.

14             THE COURT:  Do you have any quarrel with

15   your counsel and how he has represented you?

16             THE DEFENDANT:  No.  And I thank Mr. Vig

17   for his counsel and his service.  I wanted to

18   represent myself, as you know, at one point.  But I

19   thank you as well, Your Honor, for your insistence

20   that I keep my attorney.  I would not have known as

21   much as I thought I knew.  And I would not have done

22   as good of a job.  So thank you to Mr. Vig once

23   more.

24             THE COURT:  Are you satisfied with Mr. Vig?

25             THE DEFENDANT:  Yes.  Above and beyond my

expectations.  I am happy with Mr. Vig.  I thank the
services of the United States; of Mr. Harris and
Mr. Hansen and of the entire U.S. Attorney General's
and the justice system of the United States.  I
think it has been fair and just.  Thank you very
much.

THE COURT:  So, Mr. Mpetshi, so you
understand, I'm going to bring the jury back in.
Mr. Vig has indicated he's going to rest, which
means there's not going to be any evidence from the
defense.  Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Is that agreeable with you?

THE DEFENDANT:  As I said earlier, I have
no worries about it at all, or concerns.  I thank
Mr. Vig.  And I think he's done his job very well.

THE COURT:  Thank you.

Anything further before we go to jury
instructions, Mr. Harris?

MR. HARRIS:  No, Your Honor.  Thank you
very much.

THE COURT:  Mr. Vig?

MR. VIG:  No, Your Honor.  Thank you.

THE COURT:  All right.  If you will turn to
Government's Instruction 17.  There are two

 1    modifications.  The parties did not agree to any

 2    stipulations, so that needs to be removed from 17.

 3         Then the second paragraph should read as

 4    follows:  The evidence includes only what the

 5    witnesses said when they were testifying and the

 6    exhibits that I allowed into evidence.

 7         And second, I don't know if this really

 8    matters, but I took judicial notice of the fact that

 9    Jacksonville is located within the Central District

10    of Illinois.  So the third paragraph of the

11    instruction should be given in its entirety.

12         Do you agree, Mr. Harris?

13         MRS. CONROY:  Perhaps this is trivial.  I'm

14    noticing on here you had said:  Then the second

15    paragraph should read as follows, you had the

16    evidence includes only what the witness said when

17    they were testifying.  So it should be the witnesses

18    said.

19         THE COURT:  Yes, the witnesses said.

20         Highlighting the reason I don't want you to

21    translate from the unofficial transcript.  The

22    transcript isn't official until it's been reviewed

23    by Ms. Sullivan and certified.

24         MRS. CONROY:  Thank you.

25         THE COURT:  Do you agree, Mr. Harris?

 1          MR. HARRIS:  Yes, Your Honor.

 2          THE COURT:  Mr. Vig?

 3          MR. VIG:  Yes, Your Honor.

 4          THE COURT:  Okay.  Then let's flip to 20,

 5     21, 22, 23, 24, 25, 26, and 46.

 6        Any objection to Government's Instruction 20,

 7     pattern instruction 2.04?

 8          MR. VIG:  No objection, Judge.

 9          THE COURT:  Given; no objection.

10        Instruction 21.  I assume you do not object?

11          MR. VIG:  That is correct, Judge.

12          THE COURT:  Given; no objection.

13        22?  I assume there's no objection?

14          MR. VIG:  No objection.

15          THE COURT:  Given; no objection.

16        23?

17          MR. VIG:  No objection.

18          THE COURT:  Given; no objection.

19        24?

20          MR. VIG:  No objection.

21          THE COURT:  25.  Do we have an amended 25?

22     25A, which takes out, "from the Internal Revenue

23     Service."

24          MR. HARRIS:  No, Your Honor, we don't have

25     one at this time.  May I have a moment that we can

1  request a copy without the Internal Revenue Service?

2          THE COURT:  Brian, how hard would it be for

3  you to do it?

4          MR. LEE:  I can do it.

5          THE COURT:  All right.  My law clerk will

6  do it.

7      26?

8          MR. VIG:  No objection.

9          THE COURT:  Given; no objection.

10     And flip to 46.

11         MR. HARRIS:  Did you say 46, Your Honor?

12         THE COURT:  46.

13     Let's go back to 27.  27A.  Do you still prefer

14 27C to 27A and B?

15         MR. VIG:  Your Honor, if I may have a

16 moment to locate 27C.

17         THE COURT:  Would you like to see the

18 Court's.

19         MR. VIG:  Please, Judge.

20         THE COURT:  Please step up.  This is the

21 two instructions on summaries.

22     Mr. Vig, you have to repeat for my court

23 reporter.

24         MR. VIG:  I do not believe there has been

25 any indication the accuracy of the summaries has

1    been challenged.

2        Now, I guess where that leads to is the

3    Government did admit to the underlying documents

4    anyway.  Are the underlying documents going to be

5    submitted to the jury?

6            THE COURT:  The underlying documents being

7    the notes?

8            MR. VIG:  Being the -- being the uncharged

9    tax returns of all these people on the spreadsheets?

10           MR. HANSEN:  They're on CDs.  So sending

11   them into the jury would be -- they don't need to

12   be.

13           MR. HARRIS:  No.

14       (Court reporter requested clarification.)

15           MR. HARRIS:  But the count documents would

16   be submitted to the jury.

17           THE COURT:  So what is your preference?

18           MR. VIG:  Well, because the summaries have

19   not been challenged --

20       Judge, I didn't bring up with me my copy of the

21   pattern instruction to remember what the notes say

22   about how --

23           THE COURT:  Here is the comment.

24           MR. VIG:  Thank you.

25       I guess my read of it would be 27A would be

1    correct in this circumstance.

2            THE COURT:  Do you agree?

3            MR. HARRIS:  I agree.

4            THE COURT:  I'll show that your 27 -- what

5    was marked as B has been changed to 27C.  And it's

6    not given; it's withdrawn.  And 27A will be given.

7    Who has 27A?

8            MR. VIG:  I just wrote on the one I had in

9    front of me.  It's in the file.

10           THE COURT:  Here it is.  It's on the back

11   of 26.  Thank you.

12       So then 46.  There was an objection?

13           MR. VIG:  Yes, Judge.  I had brought up the

14   issue of how the heck does the jury know what an

15   electronic signature is.

16       I discussed it with the Government after the

17   initial jury instruction conference.  I was under

18   the impression the Government was going to consult

19   their expects and see what might be appropriate.  I

20   don't know if they have anything on that or not.

21           MR. HARRIS:  No, Your Honor.  But this is a

22   pattern jury instruction.

23           MR. VIG:  Right.  The instruction itself

24   simply says that if it's electronically signed, some

25   modification may be necessary.  It doesn't say how

1  to modify it.

2      My read is that, basically, the Government's

3  inserted the word electronically and that's the

4  extent of the modification.  Is that fair to say?

5          MR. HARRIS:  That is.

6          MR. VIG:  Okay.  I suppose since that

7  hasn't been put in issue, Judge, that's probably not

8  a certain anymore.

9      If the Government doesn't think a definition of

10  electronically signed is necessary.

11          THE COURT:  All right.

12          MR. VIG:  So I'll withdraw my objection.  I

13  guess -- I'm sorry, I'll try to keep it short.  I'm

14  withdrawing my objection.

15          THE COURT:  All right.  So 46 will be

16  given?

17          MR. VIG:  Yes, Judge.

18          THE COURT:  47.  I have a proposed

19  modification for 47.

20          MR. HARRIS:  Judge, may we see proposed 47?

21          THE COURT:  I think Brian has a copy for

22  you.

23      If you'd like to step up though, you may want

24  to look at the track version so you can see what's

25  been changed.  Unless he gave you a copy with red

1   line?

2          MR. HARRIS:  It's fine for the Government,

3   Your Honor.

4          THE COURT:  Okay.  47, no objection from

5   the Government.  Mr. Vig?

6          MR. VIG:  No objection to 47.

7          THE COURT:  Okay.  Given, no objection.

8      Let's go to defendant's instructions.

9      No objection to Defendant's Instruction 1,

10  inconsistent statements?

11         MR. HARRIS:  I have no objection to that

12  one, Judge.

13         THE COURT:  Mr. Vig, I assume you don't,

14  since you submitted it?

15         MR. VIG:  That's correct.

16         THE COURT:  We'll show it given; no

17  objection.

18      Defendant's 2.

19         MR. HARRIS:  Judge, looking at the

20  commentary, it says (as read:)  Seventh Circuit

21  really hasn't really clarified this jury

22  instruction.  Although there's some examples that

23  are given in the commentary, and one of the examples

24  pertains to a false tax return and false tax return

25  charges that allege multiple false statements in a

single count. I think that is what we have here
where we're alleging multiple false statements, that
being false moving expenses as well as false
educational expenses.

So I think this instruction would be
appropriate.

THE COURT: So 2, given; no objection.
Defendant's proposed 3?

MR. HARRIS: Judge, we would object to 3.
We think that the elements instruction adequately
states the fact that the defendant has to be an
active participant. And this instruction--as I read
it--is more or less for like a bystander in some
kind of physical altercation or some type of crime
of that nature, and not where the Government has to
prove willfulness.

THE COURT: So I will show Number 3 as
objected and refused.

All right. That should take care of our jury
instructions.

Closing argument?

25 was to be modified. I said it was going to
be given without objection. You have a copy of it;
correct, Mr. Harris?

MR. HARRIS: I do, yes, Your Honor.

1    THE COURT:  And you agree -- we'll, we're
2    going to call 25A --
3            MR. HARRIS:  If I could have a moment, Your
4    Honor?
5            THE COURT:  You may.
6        All it did was remove from the Internal Revenue
7    Service, remember?
8            MR. HARRIS:  In that case, we have no
9    objection.
10           THE COURT:  Yes.  Mr. Vig?
11           MR. VIG:  No objection.
12           THE COURT:  All right.  Then are you ready
13   for closing?
14           MR. VIG:  Your Honor, I have, I suppose,
15   more so a question for the Court.
16       Is it possible to -- without long delaying
17   things, provide a set of the actually -- the
18   instructions that will actually be given to both the
19   parties before closing begins?  Because, of course,
20   our copies have notes on them.
21           THE COURT:  Yes.
22           MR. VIG:  Okay.
23           THE COURT:  That will be done.
24           MR. VIG:  I appreciate that.
25           THE COURT:  So anything else?  Do I need to

limit your closings?  It's 10:15.

        MR. HARRIS:  Judge, I don't plan on
speaking more than 25 minutes.  25, 30 minutes at
max.  But I would like leeway if I do go a little
bit longer than that.  But that's my plan.

        THE COURT:  Okay.  Mr. Vig, your plan?

        MR. VIG:  That would be similar to my plan.
And again, I would appreciate similar leeway.  I
don't see a need to ask the Court to limit the
length of closings.

        THE COURT:  All right.  So I'm going to
take a break right now, put together these jury
instructions.  That should take about five minutes.

     And then if you'll advise the jury we're almost
ready, Steve.

        MR. HARRIS:  Judge -- Judge, may I request
an additional five minutes that we could take a
break to use the facilities --

        THE COURT:  Yes.

        MR. HARRIS:  -- then come back?

        THE COURT:  Yes, ten minutes.

        MR. HARRIS:  Thank you, Judge.

     (A recess was taken.)

        THE COURT:  I forgot to make a correction
on Defendant's Exhibit 2.  I believe Line 28 should

1    be Line 68.  May I correct that?

2        MR. HARRIS:  The Government would have no

3    objection.

4        MR. VIG:  Yes, please and thank you.  And I

5    apologize for the error, Judge.

6        THE COURT:  And we'll call 2A that

7    instruction.

8      So we're taking menus to the jury right now so

9    they can order from La Piazza; mine and Mr. Vig's

10   favorite restaurant.  We will that place that order

11   to be delivered or we will pick it about noon.

12       MR. HANSEN:  12:15?  So it doesn't get

13   cold.

14       THE COURT:  I will -- at the half-hour

15   mark, if you reach that, I will -- I need to do

16   something unobtrusive but that you will notice.  And

17   I hate to interrupt, but I will just say,

18   "Mr. Harris" at a half hour.  If you make it that

19   far.  I'll do the same for Mr. Vig.

20       MR. HARRIS:  Yes, Judge.

21       MR. VIG:  Yes, Judge.

22       THE COURT:  And what is your decision on

23   when you want me to read the jury instructions?

24       MR. HARRIS:  Judge, I have no preference.

25   Whatever the Court's inclined to do is fine with me.

1    MR. VIG:  Before, Your Honor.

2    THE COURT:  You want me to bore them to

3    death before or after your closings?

4    MR. VIG:  I think before.  I would rather

5    have them read to them before.

6    THE COURT:  All right, I will do so.  The

7    problems being the copies are still being run.

8    (A recess was taken.)

9    THE COURT:  Okay, let's bring them in,

10   please.

11   (The jury entered the courtroom.)

12   THE COURT:  Please be seated.  Court is

13   reconvened.

14   You have made your orders for lunch.  I hope

15   you like the restaurant as much as we do.

16   I'm going to read to you --

17   Sorry, Mr. Vig, do you rest at this time?

18   MR. VIG:  Yes, Your Honor.

19   THE COURT:  I'm going to read to you the

20   jury instructions and then I'm going to allow the

21   attorneys to make closing arguments.  And then we

22   will give you the jury instructions--each of you

23   will be given a copy--and we will allow you to

24   deliberate.

25   So we're going to show the instructions up here

1    so you can read along with it.

2         And to the translators.  I realize you have

3    copies of the instructions.  If I make a mistake in

4    the instructions, please translate the mistake.  I

5    want it to be accurate as to what is said here in

6    the courtroom.

7         Members of the jury, I will now instruct you on

8    the law that you must follow in deciding this case.

9    I will also give each of you a copy of these

10   instructions to use in the jury room.

11        You must follow all of my instructions about

12   the law, even if you disagree with them.  This

13   includes the instructions I gave you before the

14   trial, any instructions I gave you during the trial,

15   and the instructions I'm giving you now.

16        As jurors, you have two duties.  Your first

17   duty is to decide the facts from the evidence that

18   you saw and heard here in court.  This is your job,

19   not my job or anyone else's job.

20        Your second duty is to take the law as I give

21   it to you, apply it to the facts, and decide if the

22   Government has proved the defendant guilty beyond a

23   reasonable doubt.

24        You must perform these duties fairly and

25   impartially.  Do not let sympathy, prejudice, fear,

or public opinion influence you. In addition, do not let any person's race, color, religion, national ancestry, or gender influence you.

You must not take anything I said or did during the trial as indicating that I have an opinion about the evidence or about what I think your verdict should be.

The charges against the defendant are in a document called a superseding indictment. You will have a copy of the superseding indictment during your deliberations.

The superseding indictment in this case charges in Counts 1 and 2 that the defendant, West Kinioki Mpetshi, willfully made and subscribed false U.S. Individual Income Tax Returns, IRS Forms 1040, for the calendar years 2014 and 2015; and in Counts 3 through 30, willfully aided and assisted in, procured, counseled, and advised the preparation and presentation to the IRS of U.S. Individual Income Tax Returns, IRS Forms 1040, for taxpayers for the calendar years of 2014 and 2015. The defendant has pled not guilty to the charges.

The superseding indictment is simply the formal way of telling the defendant what crimes he's accused of committing. It is not evidence that the

defendant is guilty. It does not even raise a suspicion of guilt.

At all relevant times to the superseding indictment, defendant, West Kinioki Mpetshi, resided in Jacksonville, Illinois.

Defendant West Kinioki Mpetshi prepared tax returns for other individuals for a fee.

The Internal Revenue Service was an agency of the United States Department of the Treasury responsible for enforcing and administering the tax laws of the United States in collecting taxes owed to the United States.

U.S. Individual Income Tax Returns, Forms 1040, were federal forms used by taxpayers to report gross income, taxable income, and taxes due to the IRS in a particular year.

The Opportunity Credit, AOC, was a tax credit for qualified education expenses paid for an eligible student for the first four years of higher education. The AOC provides a maximum annual credit of $2500 per eligible student. And if the credit reduces the tax a student owes to zero, a student may have up to $1,000 refunded to them.

In general, a taxpayer can deduct moving expenses when moving from one home to another during

a given tax year for employment purposes.

Counts 1 through 2.

Paragraphs 1 through 6 are incorporated as though fully set out herein.

On or about the dates specified in the table below in the Central District of Illinois, the defendant, West Kinioki Mpetshi, willfully made and subscribed false U.S. Individual Income Tax Returns, IRS Forms 1040, for the calendar years specified in the table below which were verified by a written declaration that they made under the penalties of perjury, and which he did not believe to be true and correct as to every material matter.

Those returns were prepared and signed in the Central District of Illinois and were filed with the IRS. The returns were false and fraudulent as to material matters, including but not limited to those listed below in that they represented that the defendant was entitled under the provisions of the Internal Revenue laws to claim deductions for items in amounts hereinafter specified. Whereas the defendant then and there knew that he was not entitled to claim deductions in the claimed amounts.

Count 1. January 25, 2015, year 2014, Line 68, American Opportunity Credit, $1,000.

Count 2.  January 28th, 2016, year 2015, Line 26, moving expenses, $10,000, and Line 68, American Opportunity Credit, $1,000.  And the title of each of those sections, count, date of event, year, and false items.  All in violation of Title 26, United States Code, Section 7206(1).

Counts 3 through 30.  26 U.S.C. Section 7206(2), aiding and assisting in the preparation and presentation of false income tax returns.

Paragraphs 1 through 4 are incorporated as though fully set out herein.

On or about the dates specified in the table below, in the Central District of Illinois, the defendant willfully aided and assisted in, procured, counseled, and advised the preparation and presentation to the IRS of U.S. Individual Income Tax Returns, IRS Forms 1040, for the taxpayers (whose names identified in the table below by their initials) and calendar years specified in the table below.

The returns were false and fraudulent as to material matters, including, but not limited to, those listed below in that they represented that the taxpayers were entitled under the provisions of the Internal Revenue laws to claim deductions for items

1 in amounts hereinafter specified, whereas the

2 defendant then and there knew the taxpayers were not

3 entitled to the claimed deductions in the claimed

4 amounts.

5 I'm going to read to you from each of these

6 columns. They are labeled Count, Date of Offense,

7 Taxpayer, Year, False Items.

8 Again, Count 3. April 1, 2015. R.D. 2014.

9 Line 26, moving expenses, $10,000. Line 68,

10 American Opportunity Credit, $2,000.

11 Count 4. February 13, 2016. R.D. 2015. Line

12 26, moving expenses, $10,000. Line 68, American

13 Opportunity Credit, $2,000.

14 Count 5. February 23, 2016. P.Z. 2015. Line

15 26, moving expenses, $10,000. Line 68, American

16 Opportunity Credit $1,000.

17 Count 6. March 3, 2016. C.W.K. 2015. Line

18 26, moving expenses, $10,000. Line 68, American

19 Opportunity Credit, $1,000.

20 Count 7. February 22, 2015. J.M. --

21 Any objection to my summarizing same amounts as

22 before?

23 MR. HARRIS: No, Your Honor. Thank you.

24 THE COURT: Mr. Vig?

25 MR. VIG: No, Your Honor. Thank you.

1    THE COURT:  Count 8.  February 17, 2016.

2  J.M.  2015.  Same two moving expense and American

3  Opportunity Credit.

4    Count 9.  February 15, 2015.  D.M.  2014.  Same

5  two.

6    Count 10.  March 19, 2016.  D.M.  2015.  Line

7  26, moving expenses, $4500.  Line 68, American

8  Opportunity Credit $1,000.

9    Count 11.  February 27, 2015.  B.N.  2014.

10 Moving expenses 10,000, American Opportunity Credit

11 1,000.

12   Count 12.  February 18, 2016.  B.N.  2015.

13 Same two.

14   Count 13.  February 23, 2015.  F.N.  2014.

15 Line 26 moving expenses 10,000.  Line 68, American

16 Opportunity Credit 2,000.

17   February 14.  March 20, 2016.  F.N.  2015.

18 Same two expenses, 10,000, 2,000.

19   Count 15.  February 3, 2015 -- 2014, excuse me.

20 Line 26, moving expenses, 10,000.  Line 68, American

21 Opportunity Credit, 1,000.

22   Count 16.  March 16, 2016.  R.A.  2015.  Same

23 two amounts.

24   Count 17.  January 24, 2015.  S.E.  2014.  Same

25 two amounts.

Count 18.  February 7, 2016.  S.E.  2015.  Same two.

Count 19.  February 2, 2015.  D.K.  2014.  Same two.

Count 20.  January 31, 2016.  D.K.  2015.  Same two.

Count 21.  March 1, 2015.  E.T.  2014.  Same two amounts.

Count 22.  February 27, 2016.  E.T.  2015. Same two amounts.

Count 23.  March 2, 2015.  M.D.  2014.  Same two amounts.

Count 24.  March 26, 2016.  M.D.  2015.  Same two amounts.

Count 25.  February 21, 2016.  T.K.  2015. Same two amounts.

Count 26.  February 21, 2015.  F.M.  2014. Same two amounts.

Count 27.  March 8, 2016.  F.M.  2015.  Same two amounts.

Count 28.  April 1, 2016.  I.L.  2015.  Moving expenses, $7,000.  Line 16, American Opportunity Credit, $1,000.

Count 29.  February 21, 2015.  B.O.  2014. Moving expenses, 10,000.  American Opportunity

Credit, 1,000.

Count 30.  February 24, 2016.  B.O.  2015.
Same two amounts.

All in violation of Title 26, United States
Code, Section 7206(2).

The defendant is presumed innocent of each and
every one of the charges.  This presumption
continues throughout the case, including during your
deliberations.  It is not overcome unless, from all
the evidence in the case, you are convinced beyond a
reasonable doubt that the defendant is guilty as
charged.

The Government has the burden of proving the
defendant's guilt beyond a reasonable doubt.  This
burden of proof stays with the Government throughout
the case.  The defendant is never required to prove
his innocence.  He is not required to produce any
evidence at all.

You must make your decision based only on the
evidence that you saw and heard here in court.  Do
not consider anything you may have seen or heard
outside of court, including anything from the
newspaper, television, radio, the internet, or any
other source.

The evidence includes only what the witnesses

said when they were testifying under oath, the
exhibits that I allowed into evidence.

(Court reporter requested clarification.)

THE COURT:  There is a word missing.  I'm
going to add it.  Mr. Lee, if you would add it also.

The evidence includes only what the witnesses
said when they were testifying under oath and the
exhibits that I allowed into evidence.

In addition, you may recall that I took
judicial notice of certain facts that may be
considered as matters of common knowledge.  You may
accept those facts as proved, but you are not
required to do so.

Nothing else is evidence.  The lawyers'
statements and arguments are not evidence.  If what
a lawyer said is different from the evidence as you
remember it, the evidence is what counts.  The
lawyers' questions and objections, likewise, are not
evidence.

A lawyer has a duty to object if he thinks a
question is improper.  If I sustained objections to
questions the lawyers asked, you must not speculate
on what the answers might have been.  If, during the
trial, I struck testimony or exhibits from the
record, or told you to disregard something, you must

1  not consider it.

2  Give the evidence whatever weight you decide it

3  deserves.  Use your common sense in weighing the

4  evidence and consider the evidence in light of your

5  own everyday experience.

6  People sometimes look at one fact and conclude

7  from it that another fact exists.  This is called an

8  inference.  You are allowed to make reasonable

9  inferences so long as they are based on the

10  evidence.

11  You may have heard the terms "direct evidence"

12  and "circumstantial evidence".  Direct evidence is

13  evidence that directly proves a fact.  Circumstance

14  evidence is evidence that indirectly proves a fact.

15  You are to consider both direct and

16  circumstantial evidence.  The law does not say that

17  one is better than the other.  It is up to you to

18  decide how much weight to give to any evidence,

19  whether direct or circumstantial.

20  Do not make any decisions simply by counting

21  the number of witnesses who testified about a

22  certain point.

23  What is important is how truthful and accurate

24  the witnesses were and how much weight you think

25  their testimony deserves.

 1          A defendant has an absolute right not to

 2     testify or present evidence.  You may not consider

 3     in any way the fact that the defendant did not

 4     testify or present evidence.  You should not even

 5     discuss it in your deliberations.

 6          Part of your job as jurors is to decide how

 7     believable each witness was and how much weight to

 8     give each witness' testimony.  You may accept all of

 9     what a witness says or part of it or none of it.

10          Some factors you may consider include:

11          The intelligence of the witness;

12          The witness' ability and opportunity to see,

13     hear, or know the things the witness testified

14     about;

15          The witness' memory;

16          The witness' demeanor;

17          Whether the witness had any bias, prejudice, or

18     other reason to lie or slant the testimony;

19          The truthfulness and accuracy of the witness'

20     testimony in light of the other evidence presented;

21          And inconsistent statements or conduct by the

22     witness.

23          It is proper for an attorney to interview any

24     witness in preparation for trial.

25          You have heard evidence that before the trial,

1   witnesses made statements that may be inconsistent

2   with their testimony here in court. You may

3   consider an inconsistent statement made before the

4   trial only to help you decide how believable a

5   witness' testimony was here in court.

6       You have heard testimony that the defendant

7   made a statement to law enforcement personnel. You

8   must decide whether the defendant actually made the

9   statement, and, if so, how much weight to give to

10   the statement. In making these decisions, you

11   should consider all of the evidence, including the

12   defendant's personal characteristics and

13   circumstances under which the statement may have

14   been made.

15       You have heard evidence that the defendant

16   committed acts other than the ones charged in the

17   superseding indictment. Before using this evidence,

18   you must decide whether it's more likely than not

19   that the defendant prepared the tax returns that are

20   not charged in the superseding indictment. If you

21   decide that he did, then you may consider the

22   evidence to help you decide whether the defendant

23   acted willfully; that is, with the intent to violate

24   the law when he signed or prepared the tax returns

25   alleged in the superseding indictment. You may not

consider this evidence for any other purpose.

     To be more specific, you may not assume that because the defendant committed an act in the past, he is more likely to have committed the crimes charged in the superseding indictment.  The reason is that the defendant is not on trial for these other acts.  Rather, he is on trial for submitting a false income tax return as alleged in Counts 1 and 2 of the superseding indictment, and aiding or assisting in the preparation of a false tax return as alleged in Counts 3 through 30 of the superseding indictment.

     The Government has the burden to prove beyond a reasonable doubt the elements of the crimes charged in the superseding indictment.  This burden cannot be met with an inference that the defendant is a person whose past acts suggest bad character or a willingness or tendency to commit crimes.

     You have heard a witness, namely Matthew Kron, who gave opinions and testimony about the U.S. Individual Income Tax Returns, IRS Forms 1040, and the resulting tax consequences.  You do not have to accept this witness' opinions.  You should judge this witness' opinions and testimony the same way you judge the testimony of any other witness.

1    In deciding how much weight to give to these

2  opinions and testimony, you should consider the

3  witness' qualifications, how he reached his

4  conclusions, and the factors I've described for

5  determining the believability of testimony.

6    You have heard a witness, namely Nicholas

7  Gingrass, who gave opinions and testimony about the

8  analysis of electronic devices recovered from the

9  defendant's residence at 511 West Beecher Avenue,

10  Jacksonville, Illinois.  You do not have to accept

11  this witness' opinions.  You should judge this

12  witness' opinions and testimony the same way you

13  judge the testimony of any other witness.

14    In deciding how much weight to give to these

15  opinions and testimony, you should consider the

16  witness' qualifications, how he reached his

17  conclusions, and the factors I've described for

18  determining the believability of testimony.

19        MRS. CONROY:  Give us a chance to catch up,

20  please.

21    Thank you, Your Honor.

22        THE COURT:  Certain summaries were admitted

23  in evidence.  You may use those summaries as

24  evidence.

25    If you have taken notes during the trial, you

may use them during deliberations to help you
remember what happened during the trial.  You should
use your notes only as aids to your memory.  The
notes are not evidence.  All of you should rely on
your independent recollection of the evidence and
you should not be unduly influenced by the notes of
other jurors.  Notes are not entitled to any more
weight than the memory or impressions of each juror.

Counts 1 and 2 of the superseding indictment
charge the defendant --

There should be an S removed there; if you
would make that change, Mr. Lee.

-- the defendant with filing a false tax
return.  In order for you to find the defendant
guilty of this charge, the Government must prove
each of the five following elements beyond a
reasonable doubt:

1.  The defendant prepared an income tax
return; and

2.  The income tax return was false as to a
material matter as charged in the account; and

3.  The defendant signed the income tax return
which contained a written declaration that it was
made under penalties of perjury; and

4.  The defendant acted willfully; that is, he

knew he had a legal duty to file a truthful tax
return, but when he signed the return, he did not
believe that it was truthful as to a material
matter; and

    5.  The defendant filed the income tax return
with the Internal Revenue Service.

    If you find from your consideration of all the
evidence that the Government has proved each of
these elements beyond a reasonable doubt as to the
charge you are considering, then you should find the
defendant guilty of that charge.

    If, on the other hand, you find from your
consideration of all the evidence that the
Government has failed to prove any one of these
elements beyond a reasonable doubt as to the charge
you're considering, then you should find the
defendant not guilty of that charge.

    Counts 3 through 30 of the superseding
indictment charge the defendant--remove that S--with
aiding and abetting in the preparation of a false
tax return.

    In order for you to find the defendant guilty
of this charge, the Government must prove each of
the three following elements beyond a reasonable
doubt:

1. The defendant aided, assisted in, or procured the preparation of an income tax return that was false as to a material matter. There must be some affirmative participation in the filing of a false tax return. The return must be filed with the Internal Revenue Service. The Government is not required to prove that the defendant signed the tax return; and

2. The defendant knew that the income tax return was false; that is, that the income tax return was untrue when it was made; and

3. The defendant acted willfully; that is, with the intent to violate the law.

If you find from your consideration of all the evidence that the Government has proved each of these elements beyond a reasonable doubt as to the charge you're considering, then you should find the defendant guilty of that charge.

If, on the other hand, you find from your consideration of all the evidence that the Government has failed to prove any one of these elements beyond a reasonable doubt as to the charge you're considering, then you should find the defendant not guilty of that charge.

Counts 2 through 30 charge the defendant with

knowingly and willfully inserting more than one
false item on a tax return.  The Government is not
required to prove that the defendant knowingly and
willfully inserted every one of the false items
alleged in the particular count you're considering.
However, the Government is required to prove that
the defendant knowingly and willfully inserted at
least one of the false items that is alleged in the
particular count.

To find that the Government has proven this,
you must agree unanimously on which particular false
item the defendant knowingly and willfully inserted,
as well as all of the other elements of the crime
charged.

For example, on Count 30, if some of you were
to find that the Government has proved beyond a
reasonable doubt that the defendant knowingly and
willfully inserted false information on Line 26, and
the rest of you were to find that the Government has
proved beyond a reasonable doubt that the defendant
knowingly and willfully inserted false information
on Line 68, then there would be no unanimous
agreement on which particular false item the
defendant knowingly and willfully inserted.

On the other hand, if all of you were to find

1    that the Government has proved beyond a reasonable

2    doubt that the defendant knowingly and willfully

3    inserted false information on Line 26, then there

4    would be a unanimous agreement in which particular

5    false item the defendant knowingly an willfully

6    inserted.

7            THE CLERK:  Mr. Lee, if you would take it

8    off and put it back on, sometimes it will auto

9    correct.  Autofocus, excuse me.

10           THE COURT:  The Government is not required

11   to prove that a taxpayer for whom the false tax

12   return was filed knew the return was false.

13       A false matter is material if the matter was

14   capable of influencing the Internal Revenue Service.

15       With regard to Counts 1 and 2 of the

16   superseding indictment, if you find that the

17   Government has proved beyond a reasonable doubt that

18   the defendant electronically signed the tax return,

19   then you may infer that the defendant knew of the

20   contents of the return.  You are not required,

21   however, to infer this.

22       The defendant has been accused of more than one

23   crime.  The number of charges is not evidence of

24   guilt and should not influence your decision.  You

25   must consider each charge and the evidence

concerning each charge separately. Your decision on one charge, whether it is guilty or not guilty, should not influence your decision on any other charge.

In deciding your verdict, you should not consider the possible punishment for the defendant who is on trial. If you decide that the Government has proved the defendant guilty beyond a reasonable doubt, then it will be my job to decide on an appropriate punishment.

A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.

If the defendant acted in good faith, then he lacked the willfulness required to prove the offenses of making a false income tax return as charged in Counts 1 and 2, and aiding and assisting in the preparation and presentation of a false income tax as charged in Counts 3 through 30.

The defendant acted in good faith if, at the time, he honestly believed the truthfulness or validity of the tax credit and moving expenses that

1　the Government has charged as being false.  The

2　defendant does not have to prove his good faith.

3　Rather, the Government must prove beyond a

4　reasonable doubt that the defendant acted willfully

5　as charged in Counts 1 through 30.

6　　　　A person does not act willfully if he believes

7　in good faith that he is acting within the law and

8　that his actions comply with the law.  Therefore, if

9　the defendant actually believed that what he was

10　doing was in accord with the income tax laws, then

11　he did not willfully make a false statement on a tax

12　return.  This is so even if the defendant's belief

13　was not objectively reasonable as long as he held

14　the belief in good faith.  However, you may consider

15　the reasonableness of the defendant's belief

16　together with all the other evidence in the case in

17　determining whether the defendant held that belief

18　in good faith.

19　　　　Once you are all in the jury room, the first

20　thing you should do is choose a foreperson.  The

21　foreperson should see to it that your discussions

22　are carried on in an organized way and that everyone

23　has a fair chance to be heard.  You may discuss the

24　case only when all jurors are present.

25　　　　Once you start deliberating, do not communicate

about the case or your deliberations with anyone
except other members of your jury.  You may not
communicate with others about the case or your
deliberations by any means.  This includes oral or
written communication, as well as any electronic
method of communication such as telephone, cell
phone, Smart Phone, iPhone, Blackberry, computer,
text messaging, instant messing, the internet, chat
rooms, blogs, website or services like Facebook,
MySpace, LinkedIn, YouTube, Twitter or any other
method of communication.

        MRS. CONROY:  One moment, please, Your
Honor.

        THE COURT:  If you need to communicate with
me while you are deliberating, send a note through
the Court Security Officer.  The note should be
signed by the foreperson or by one or more members
of the jury.  To have a complete record of this
trial, it is important that you do not communicate
with me except by a written note.

    I may have to talk to the lawyers about your
message, so it may take me some time to get back to
you.  You may continue your deliberations while you
wait for my answer.

    Please be advised that transcripts of trial

testimony are not available to you.  You must rely on your collective memory of the testimony.

If you send me a message, do not include the breakdown of any votes you may have conducted.  In other words, do not tell me you are split 6 to 6 or 8 to 4 or whatever your vote happens to be.

Verdict forms have been prepared for you.  You will take these forms with you to the jury room. When you've reached unanimous agreement, your foreperson will fill in, date, and sign the appropriate verdict forms.  Each of you will sign it.  Advise the Court Security Officer once you've reached a verdict.  When you come back to the courtroom, I will read the verdicts aloud.

The verdict must represent the considered judgment of each juror.  Your verdict, whether it is guilty or not guilty, should be unanimous.

You should make every reasonable effort to reach a verdict.  In doing so, you should consult with each other, express your own views, and listen to your fellow jurors' opinions.

Discuss your differences with an open mind.  Do not hesitate to re-examine your own view and change your opinion if you come to believe it is wrong, but you should not surrender your honest beliefs about

the weight or effect the evidence just because of
the opinions of your fellow jurors or just so that
there can be a unanimous verdict.

The 12 of you should give fair and equal
consideration to all the evidence.  You should
deliberate with the goal of reaching an agreement
that is consistent with the individual judgment of
each juror.

You are impartial judges of the facts.  Your
sole interest is to determine whether the Government
has proved its case beyond a reasonable doubt.

And then we have the verdict forms.

1.  We, the jury, find the defendant, West
Kinioki Mpetshi--and then there is a blank for
guilty or not guilty--of willfully making and
subscribing false U.S. Individual Income Tax
Returns, IRS Forms 1040, for the calendar year 2014,
which was verified by a written declaration that
they were made under the penalties of perjury, and
which the defendant did not believe to be true and
correct as to every material matter as charged in
Count 1 of the superseding indictment.

Paragraph 2.  We, the jury, find the defendant,
West Kinioki Mpetshi--and there's a blank for guilty
or not guilty--of willfully making and subscribing

false U.S. Individual Income Tax Returns, IRS Forms
1040, for the calendar year 2015, which was verified
by a written declaration that they were made under
the penalties of perjury and which the defendant did
not believe to be true and correct as to every
material matter as charged in Count 2 of the
superseding indictment.

Paragraph 3. We, the jury, find the defendant,
West Kinioki Mpetshi--there's a blank for guilty or
not guilty--of willfully aiding and assisting in the
preparation and presentation to the IRS of U.S.
Individual Income Tax Returns, IRS Forms 1040 for
taxpayer R.D. in calendar year 2014 as charged in
Count 3 of the superseding indictment.

Is it acceptable, counsel, if I simply indicate
what is different in Paragraphs 4 through 30?

MR. HARRIS: That would be fine with the
Government, Your Honor.

THE COURT: Mr. Vig?

MR. VIG: Yes, Your Honor.

THE COURT: So Paragraph 4 is R.D. in
calendar year 2015.

Paragraph 5 is taxpayer P.Z. in calendar year
2015.

Paragraph 6 is taxpayer C.W.K. in calendar year

1    2015.

2        Paragraph 7, taxpayer J.M. in calendar year

3    2014.

4        Paragraph 8, taxpayer J.M. in calendar year

5    2015.

6        Paragraph 9, taxpayer D.M. in calendar year

7    2014.

8        Paragraph 10, taxpayer D.M. in calendar year

9    2015.

10       Paragraph 11, taxpayer B.N. in calendar year

11   2014.

12       Paragraph 12, taxpayer B.N. in calendar year

13   2015.

14       Paragraph 13, taxpayer F.N. in calendar year

15   2014.

16       Paragraph 14, taxpayer F.N. in calendar year

17   2015.

18       Paragraph 15, taxpayer R.A. in calendar year

19   2014.

20       Paragraph 16, taxpayer R.A. in calendar year

21   2015.

22       17, taxpayer S.E., 2015.

23       19, taxpayer D.K., 2014.

24       Go back up to Paragraph 18.  Taxpayer S.E.,

25   2015.

1    19, D.K., 2014.

2    20, taxpayer D.K., 2015.

3    21, taxpayer E.T., 2014.

4    22, E.T., 2015.

5    23, taxpayer M.D., 2014.

6    24, M.D., 2015.

7    25, T.K., 2015.

8    26, F.M., 2014.

9    27, F.M., 2015.

10   28, I.L., 2015.

11   29, B.O., 2014.

12   And 30, B.O., 2015.

13       And then there is a sheet with signature lines

14   for the foreperson and the date.

15       Your closings.  Mr. Harris.

16       If you would like to stand and stretch for a

17   second before he begins, you may.

18           MR. HARRIS:  Thank you, Your Honor.  May it

19   please the Court?

20           THE COURT:  Yes.

21           MR. HARRIS:  Co-counsel.  Mr. Hansen.  Mr.

22   Vig.

23           MR. VIG:  Counsel.

24           MR. HARRIS:  Ladies and gentlemen of the

25   jury.  It's been a long trial.  Two weeks.  It's

been complicated by the fact that we've had
interpreters for the Government as well as for the
defendant.  And we appreciate your participation.
We appreciate your interest and your focus
throughout this two weeks.

There's a huge problem among Congolese people
working in the Jacksonville-Beardstown area, and at
Cargill in particular, among the preparation of
false tax returns.  There are, as you've heard,
several tax preparers that are in that community
that assist in the preparation of false tax returns,
including the defendant.

The preparers had many ways of creating these
false tax returns that you've seen and heard:
Dependents, moving expenses, educational expenses
and credits, jobs that weren't held, various
different ways.

The defendant's method was pretty consistent,
always using moving expenses and educational
expenses to obtain an educational credit, an
American Opportunity Credit provision.

The Government is particularly interested in
this case because of the message it will send the
rest of the community about:  This is wrong.  You
can't do that.

Now, the other tax preparers are not on trial today. The taxpayers that may have known, some of whom may have known of these false items on their tax returns are not on trial today. The defendant's on trial today.

And the evidence is offered to show, our evidence is offered to show that the defendant actually participated in the making of these false returns for the 16 taxpayers who testified before you from the Congolese community, as well as the two tax returns that he prepared himself.

And the defendant is not charged with submitting false dependents or -- all that evidence you heard involving the false dependents or false residences and false jobs, the defendant is not charged with that. He's only charged with preparing tax returns that contained false moving expenses and false American Opportunity Credits.

And as you heard from Agent Goleman and Amegboh, when the defendant was interviewed, he admitted preparing his false tax returns for the year 2014 in that he put the American Opportunity Credit, that he had not earned, on that return. And for the 2015 return had added moving expenses of $10,000. And I think you've heard evidence of how

this occurred.

I think you've heard evidence of how the defendant got involved in preparing false tax returns. If you'll recall from the evidence, the defendant moved to the United States in 2011. He started working at Cargill about four months later. He's a very bright individual, and he started school at Lincoln Land the following year, earning an A in chemistry, A's in reading and writing, and progressed very quickly. He became well-known in the Congolese community and at Cargill as being somebody you could go to to translate French into English. He worked with the FDA in an area that required someone to learn English. Wearing an orange cap, orange hat.

And for the year 2000 -- the tax year 2013, he got a W-2 and sought out someone in the Congolese community who could help him with his taxes. And he got ahold of Philip Biumba. And Philip was one of these tax preparers that we're talking about that you've heard about who prepared the defendant's tax return. And he had on that tax return false items: Moving expenses and educational credits.

Defendant had his tax return prepared, he got a refund, and as you've heard from the testimony of

the agents about during their interview, the
defendant thought, "I can do this. Why can't I do
this and start making money?" So he started
preparing tax returns for the year 2014. Starting
with his tax return.

Now, his tax return did not have moving
expenses that year, but he did have the American
Opportunity Credit which he told the agents was
false. He had studied Mr. Biamba's tax return to
learn how to prepare these tax returns. And he
learned, obviously, when he got his refund, that it
was something that could slide by and no one would
notice at the IRS.

So he went on to prepare other tax returns for
other individuals. Charging them $250. And what
was consistent about the tax returns that he
prepared were false moving expenses and false
Educational Opportunity Credit expenses.
Consistently, almost with every tax return.

For the following year, obviously, word got out
that Mr. Biumba was pretty good at doing this. And
the numbers increased, 173 tax returns or so I think
was the evidence that he prepared for the year
2000 -- the tax year 2015.

That's how he got involved in preparing false

tax returns.

He made quite a bit of money in the process. You heard Agent Matt Kron testify that from these tax returns, the Government had a tax loss of approximate $86,601. And he also testified that the defendant, in the year 2014, given the amount of fee that he submitted or he required for these tax returns at $250 a return, made something like roughly $13,000.

Doing the math for 2015, at $250 a run, about 173 returns, the defendant made approximately $43,000 that year, for a total of $56,000 for a few months work in 2014 -- or 2015 and 2016 for those tax years, for the tax years 2014 and 2015.

It's clear that the defendant intended to submit these false tax returns. It's clear from the number of tax returns that were submitted that had the exact same items that were false.

It's clear from his admission when he was interviewed that he knew what he was doing was against the law.

It's clear from his statement to the agents when they interviewed him that the reason he did these things was to get a bigger tax return. Or refund.

And it makes sense, logically, that if there are other tax prepares out in the community that are doing the same thing, that you're going to be in competition with those tax preparers. And that you would also need to have items on your tax return which would generate a bigger tax refund.

Now, you've heard testimony about the line items for educational opportunity credits. All of them, or most of them, had the maximum amount of the credit that you could take because the expenses were at the maximum; $4,000 per return.

You heard from the 16 taxpayers whose returns are set forth in the indictment that they never provided the defendant with any moving expenses or educational credits. In fact, there was one witness who testified that he submitted his 1090-AT form, which is the form that an institution, educational institution such as Lincoln Land provides to the government, and in this case to the student, showing how much he had in educational expenses. Which didn't total $4,000. But on his return, the amount was $10,000 as well. So it's clear that the defendant was making all of these expenses up.

With regard to the moving expenses. You'll look at the tax returns and you'll see that there

were a number of tax returns for the year 2014 and the year 2015 which had the same address. And when you think about it, is it -- is it logical that someone would incur $10,000 in moving expenses and would that incur it back-to-back?

And these moving expenses were supposed to be for employment. And these were all Cargill workers that worked with the defendant. There was no evidence that they were transferred by Cargill to some other place where they might be entitled to moving expenses.

So it was clear that the defendant was simply making these moving expenses up for them, as well as for himself. You heard the testimony of the Mediacom, Mr. Noor Effendi, who testified that looking at the documents that Mediacom had, he could tell that the router for Mr. Mpetshi had been disconnected and then reconnected once he left State Street and moved to Beecher. That was in January of 2016. Yet Mr. Mpetshi's tax returns have moving expenses for the year 2015. Obviously, a false item on his tax returns.

And you've heard a lot of discussion and evidence regarding dependents and whether or not the dependent information is incorrect. And whether or

1    not it was provided by the taxpayers.

2       Again, Mr. Mpetshi is not charged with

3    dependent information. And frankly, even had those

4    taxpayers known about the falsity of the tax return,

5    it still couldn't exonerate Mr. Mpetshi, because

6    Mr. Mpetshi is charged with aiding and assisting in

7    the preparation of a false tax return.

8       And one thing is clear, I believe, from the

9    evidence, I think clearly from the evidence, that

10    these taxpayers could not prepare their own income

11    tax return. They mostly were French-speaking. Some

12    didn't -- most didn't read or write English. They

13    needed someone like Mr. Mpetshi to prepare those tax

14    returns for them. They paid him $250, $300,

15    sometimes for husband and wife, $600, for a reason.

16    Because they couldn't do it themselves. They paid

17    Mr. Mpetshi for his assistance in submitting the tax

18    return.

19       Now, in this case, the evidence, I think, shows

20    that Mr. Mpetshi put those false items on the tax

21    return himself. All of the taxpayers that testified

22    denied telling him about the moving expenses,

23    educational credits, they didn't know that they were

24    on there. They're meetings with Mr. Mpetshi lasted

25    10, 15 minutes. They didn't have a sit-down or a

1  face-to-face with Mr. Mpetshi at all.  They just

2  provided him with W-2s, identification documents,

3  and that was pretty much it.

4       And we also presented evidence showing an Eagle

5  form document that had Mr. Mpetshi's cell phone

6  number on it that showed items for -- to be circled,

7  like moving expenses, education expenses, that had

8  not been circled.  And that had been presented in

9  the case with our witness through an individual who

10  was collecting money for Mr. Mpetshi and was to give

11  those forms to Mr. Mpetshi along with his fee.

12       I think Max Ngoyi Masungula testified that he

13  was the one who gave Mr. Mpetshi a 1090-AT form that

14  had educational expenses at Lincoln Land Community

15  College in the year 2014 of $2,254.  But yet the tax

16  return that Mr. Mpetshi prepared had educational

17  expenses of $4,000.

18       So what the Government must prove as far as the

19  elements instructions are concerned, let's look at

20  the first two counts, filing a false tax return,

21  Counts 1 and 2.

22       The Government must prove:

23       First; the defendant prepared an income tax

24  return.  And in this case, the defendant admitted

25  when he was interviewed that he prepared his returns

1   for the years 2014 and 2015.

2       The tax returns were submitted electronically

3   using the defendant's IP address.  His cell phone

4   number was included on the 2015 tax -- a number of

5   the 2015 tax returns.  And there's no evidence at

6   all that anyone else in Mr. Mpetshi's house prepared

7   those returns.

8       The second element the Government must prove is

9   that the income tax return was false as to a

10  material matter as charged in Counts 1 and 2.

11      Count 1 and 2 charge that the tax return was

12  false because moving expenses and educational

13  expenses were false.  The evidence proved that the

14  moving and educational expenses or credits on the

15  2014 and 2015 tax returns were false.

16      With regard to Count 1, the defendant

17  admitted--again, when being interviewed--that he had

18  not incurred the educational expenses listed on the

19  Form 8863, and that he added the items to the return

20  so that he would get a bigger refund.

21      Shanda Byer, Associate Vice-President of

22  Enrollment at Lincoln Land Community College, and

23  those -- her records showed the defendant's tuition

24  costs were less than $1500, and he received

25  financial aid in over -- of over $2800, resulting in

an actual refund of over $1300 for that year.

With regard to Count 2 for the 2015 tax return. The defendant admitted, when interviewed, that he had not incurred the educational expenses listed on the Form 8863. And that he added the items, again, to increase his refund.

Likewise, Shanda Byer of the -- the -- Shanda Byer of Lincoln Land Community College, her records showed that the defendant paid tuition in the amount of $916 in the spring of 2015, and then withdrew from a number of other classes that he had.

With regard to his 2015 tax return charged in Count 2 of the superseding indictment, the defendant claimed that he had $10,000 in moving expenses in 2015. But he admitted when he was interviewed that he had not incurred $10,000 in moving expenses in that year. And the evidence showed that, in fact, again, he did not move in 2015. It was 2016 when he moved. Nor did the defendant move to take a new job, as required to be entitled to a moving expense.

So the Government has proved that the educational expenses on the 2014 and 2015 tax returns were false and that the moving expense on the 2015 tax return was false.

Now, I think the Court will instruct you that a

false matter is material if the matter was capable
of influencing the Internal Revenue Service.  IRS
Agent Matt Kron testified that the moving and
educational expenses influenced the calculation of
the defendant's taxes and the refund that he was
entitled to receive.

Third element that the Government must prove is
that the defendant signed the income tax return
which contained a written declaration that it was
made under penalty of perjury.  And you'll recall
that Rose Linton, the court witness coordinator for
the Internal Revenue Service testified that when a
tax return is electronically filed using a pin, the
signature page contains a banner similar to the one
contained on a paper tax return, which states -- she
testified states:  "Under penalties of perjury, I
declare that I have examined this return and the
accompanying schedules and statements to the best of
my knowledge and belief that they are true, correct,
and complete."

Lisa Skelly testified -- she was from TurboTax,
testified for electronic filing of signature pages,
there appears a consent to disclose statement that,
under penalty of perjury, "The sender has examined
the return and to the best of my knowledge and

1  belief, it is true, correct, and complete." And she

2  testified that every time a return is filed

3  electronically, the consent to disclose statement

4  appears.

5  Fourth, the Government must prove the defendant

6  acted willfully; that is, he knew he had a legal

7  duty to file a truthful tax return. But when he

8  signed the return, he did not believe it was

9  truthful as to a material matter.

10  And the evidence on this, again, goes to the

11  defendant's interview, when he admitted to the

12  agents that his 2000 -- 2014 and 2015 return

13  contained false AOL credits and 2015 return also

14  contained a false moving expenses.

15  Agent Goleman testified that she asked the

16  defendant if he knew that adding these false items

17  on his tax return was against the law. And he said

18  yes, he did. Agent Amegboh testified that the

19  defendant's response was that he was aware of the

20  fact that he -- what he was doing was illegal. So

21  he knew of his legal obligation to file a truthful

22  return and admitted that he knew that at the time he

23  was interviewed.

24  Fifth element that the Government must prove is

25  that the defendant filed the income tax return with

the Internal Revenue Service.

Again, Rose Linton, the court witness coordinator of the IRS, testified that all of the tax returns in all of the Counts 1 through 30 with blue sheets were certified by her as true and accurate, and had been filed electronically with the IRS.

Now, with Counts 3 through 30 that charge the defendant with aiding and betting in the preparation of a false return, the elements are:

First, that the defendant aided, assisted, or procured in the preparation of an income tax return that was false as to a material matter.  There must be some affirmative participation in the filing of the false tax return.  And the return must be filed with the Internal Revenue Service.  The Government's not required to prove that the defendant signed the tax return.

All the taxpayers that testified, all 16, testified that they provided the defendant with documents to prepare their returns, and the defendant prepared, the defendant prepared their returns.

The taxpayers all testified that they paid the defendant money to do their returns because they

couldn't do the returns themselves.  They spoke very
little English and did not understand the tax laws.

The evidence shows that all of the returns were
filed from the defendant's IP address.  And that
many of the returns contained the defendant's cell
phone number.

Second element that the Court instructed you on
is that the defendant knew that the income tax
return was false.  That is, that the income tax
return was untrue when it was made.

Again, when the defendant was interviewed, he
admitted that he knew that the income tax returns
were false, and that he put the moving expenses and
educational credits on the return to increase the
refunds.

Almost every one of those returns had moving
expenses and AOL credits.  And again, Lincoln Land
Community College records show that most of those
taxpayers hadn't attended Lincoln Land Community
College.  Some had, without charge; and others, who
had charges, did not have charges of the $4,000.

Next, as far as aiding and abetting the filing
of false returns, the Government must prove that the
taxpayer's knowledge of the false returns -- sorry.
Knowledge of the false items on those returns.

1  Again, all of the witnesses denied that they

2  had moving and educational expenses.  Clearly, those

3  items on the tax returns were false.

4  Now, I just want to talk just a moment briefly

5  about the dependent information that was contained

6  on the tax returns, because there was a lot of

7  testimony particularly on cross-examination about

8  information that was provided by the taxpayers for

9  dependents.

10  Again, the defendant's not charged with

11  providing dependent information.  And while some of

12  that information could have been false through the

13  misunderstanding of the witnesses of what dependents

14  actually is, or because they actively were

15  participating in providing false information, again,

16  it doesn't exonerate the defendant from filing --

17  from aiding and assisting taxpayers in the

18  submission of false tax returns.

19  As long as the evidence is that the defendant

20  knew those tax returns were false, he assisted in

21  the preparation of those false tax returns, and he

22  submitted those false tax returns, the Government

23  has proven the fact that the defendant has -- the

24  offense that the defendant has submitted false tax

25  returns by assisting these taxpayers.

1    The final element of assisting the filing of a

2    tax -- false tax return is that the defendant acted

3    willfully; that is, with the intent to violate the

4    law.

5    Perhaps the most important piece of evidence in

6    the Government's case, along with all the others, is

7    the fact that the defendant admitted that what he

8    did he knew was against the law.  That proves

9    willfulness.  He knew there was -- he had a duty to

10   file truthful returns and didn't do it.  Didn't do

11   it primarily so that the taxpayers and himself would

12   get larger refunds.

13   The superseding indictment in this case, as the

14   Court's already read, is 30 Counts.  Each one of

15   those counts applies to a separate tax return.  Each

16   one of those counts also relates to a separate

17   exhibit the Government admitted -- had admitted into

18   evidence.

19   So, for example, Count 1, applying --

20   pertaining to the defendant's false tax return for

21   the year 2014, the exhibit or the tax return

22   associated with that Count is Government's

23   Exhibit 1.  Count 2, applying to the defendant's tax

24   year 2015, the tax return in evidence that applies

25   to that Count is Exhibit 2.  And so on and so forth.

So all 30 counts charged in the indictment relate to the first 30 tax returns that you'll have in evidence.

There may be, as you will see from the superseding indictment, misspellings with the initials of the names of some of the taxpayers.  But you will be able to correlate the counts with the exhibits by looking at the exhibit numbers, Count 1, Exhibit 1, and so forth.

THE COURT:  You're at a half-hour, Mr. Harris.

MR. HARRIS:  Thank you, Your Honor.

Ladies and gentlemen, in conclusion, the Government has proven each and every one of the 30 counts that have been charged against Mr. Mpetshi beyond a reasonable doubt.  And at the conclusion of your deliberation, we would ask that you find the defendant, Mr. Kinioki Mpetshi -- West Kinioki Mpetshi, guilty of the charges in the indictment.

Thank you.

THE COURT:  Thank you, Mr. Harris.

Mr. Vig, your closing.

MR. VIG:  Yes, Your Honor, thank you.

May it please the Court?

THE COURT:  Yes.

1    MR. VIG:  Counsel.  Counsel.  Mr. Mpetshi.

2    Ladies and gentlemen, it has been a long two

3  weeks.  I, like I'm sure all of you, was glad that

4  circumstances were such we had the morning off on

5  Thursday.  I was able to go with my family to the

6  State Fair Wednesday night.  And we walked

7  through -- my oldest is five.  As soon as we get

8  there, he points to the Ferris wheel and tells us

9  about 15 times that's the one thing he wants to do.

10  So we promised him as soon as we got something to

11  eat, we will go there.

12    So we get to the kiddy carnival area.  And the

13  games reminded me of one of my first jobs right

14  after high school.  I worked at the fairgrounds

15  doing the maintenance crew.  And at the time, the

16  carnival was down in Happy Hollow.

17    And during the fair, I was working 12-hour

18  days.  Frankly, not much has changed since then I

19  guess.  But anyway, during a break, we had -- you

20  know, I was able to walk around, and then I'm

21  cutting through.  You know, because we were

22  maintenance employees, got a little badge on our

23  T-shirt.  So I'm just cutting through an area of the

24  carnival that's set up that the general public does

25  not walk through.  which is I'm walking by the side

of one of those free-throw basketball games.  Okay.

And as I walk by the side of the free-throw game, I happen to see that the hoops, which look just like regulation hoops from the front, were actually little oval footballs, and there was hardly any room from the front and back for the ball to fit through.  But I would have never known it had I not looked at it from that perspective.

It was a case where, obviously, from one perspective, something could appear to be very clearly and obviously one thing, but when you look at it from somewhere else, it looks entirely different.

There's different reasons, of course, why people only see one angle.  Sometimes it's just pure chance.  Sometimes people take active steps to make sure that it's only looked at from that angle, like the guys that set up the basketball game at the fairgrounds.  It's designed to be looked at from the front; right?

Sometimes it's more our pre-existing beliefs, opinions, biases.  If you think of it from, I guess, the perspective of that game, part of the reason it works is that the visual from the front matches our pre-existing belief about what it looks like.  And

because it appears to be twice the size of the basketball from the front, we naturally assume that it is regulation because from that perspective, it sure looks like it.

Our life and common experiences are filled with examples like that where, because we come at it from a certain perspective, our pre-existing beliefs, our expectations, our past experience about something, we naturally--even without intending to--see it from that perspective.

Around -- and there's a quote, just very short, in this old book To Kill a Mockingbird. (As read:) People generally see what they look for and hear what they listen for. In other words, people tend to interpret everything that they see and hear in a way that matches what they were already expecting to see and hear. Just human nature.

Then I remembered the next thing that happened after. So I saw it for the first time from this angle and I started chuckling, and -- and the gentleman who was working the game--at the time, we called those guys carnies because they were the, you know, traveling carnival workers; right. He was an older guy -- well, he was probably younger than I am now, but I started chuckling and said something

about, "Oh, that's how you do it." And he was very
offended, like indignant. There's nobody around,
general public isn't around, no particular reason,
you know, he didn't invent the game, but he is
indignant. And he's saying, you know, "No, I never
told -- you know, we've never claimed that this is
regulation. There's no sign here saying it is
regulation." You know, there's no -- there's
nothing misleading about this, right?

The longer people tell themselves the story or
belief, the more likely they are to really believe
it themselves. Even if it's obviously not the case.
Obviously, the game is misleading, but if you work
it for a few years, you get tied into it.

Now, there's plenty of reasons not to believe
the Government's witnesses here. Now, I know we
just heard the prosecutor talk about the -- well,
but even if they were knowing participants and all
that--and I'll get back to that in just a
moment--but remember, for every single witness, what
did we hear time after time? And you trusted the
honesty and integrity of the tax preparer to prepare
the return for you.

We had a guy who's a lawyer, we had a guy who
had studied criminal justice, worked for a

prosecutor, a guy who's an electrical engineer.
They got no explanation for how it is that they keep
having false tax returns.  They got preparers in
Texas, in New York, in Washington, in Chicago.  This
is all news to them.

We learned that dependents, you have to have a
real name and real Social Security number, because
that part is actually checked out.  So they come to
the preparer with that information.  So there's no
question that if they knew they were lying about
that, say because they knew that they gave somebody
115 bucks to go buy a cell phone and in exchange got
dependent information for a year, that's the easy
part to prove.  The rest of it, we're just supposed
to take their word for it that no, they didn't lie
about this, they didn't provide this information.
Why couldn't they?

Every single, again, so-called taxpayer, every
single non-Government employee witness we heard from
had a reason to lie.  Every single one.  Obviously,
nobody wants to get prosecuted.  Nobody wants to get
deported.  Everybody wants to not be caught.  So
what do you do?  You blame the guy you paid $250 to
do your taxes.

He's not getting a commission.  He's not

getting a cut of the refund.  The only thing that
got taken out of the refund in some cases was a
TurboTax fee.  He just gained a single flat fee to
type in the information that's given to him.

Now, we heard one particular witness that was
mentioned in the Government's closing, Fnu Ngoyi, or
Max as he goes by now, and --

Madam Clerk, may I have my -- I asked the Clerk
for the HDMI input on my counsel table.

And so we saw, about a year and a half after he
had talked to the IRS agents, he made this video.
And the testimony is it's not mostly about taxes.
Some -- the education benefit is mentioned, about
how you get that.  But there's a lot of talking
about just improving your situation in life.  But --

And the title here.  How to Increase Your
Refund in an Official Way.  In a totally legal,
legitimate way.  That's the click-pick title and
that's posted in January.  And then we saw that two
months later, he's filing a tax return with itemized
deductions -- let's see, the 6,000, the charity.
12,500 in unknown other expenses.  The case agent
admitted, suspicious-looking clearly.

So Max, after posting -- or participating in
the filming of this video, the title How to Increase

Your Tax Refund in a Totally Legit Way, two months later, someone on Max's behalf is filing a tax return claiming not only those same education credits, but also itemized deductions in the amount of $19,656. And Max has definitely increased his refund. It doesn't look like it's a total legit way.

Clearly, the Government goes into this with the working theory that it's the taxpayers. Gosh darn it -- or I'm sorry, it's the tax preparers. It's these unscrupulous tax preparers. No doubt that's the perspective they come from. But there is zero effort, zero effort undertaken to investigate or challenge or look into the basic claim, "I had no idea. That's -- gosh, that's the first time I've seen that there, I swear. No, that's -- I have nothing to do with that. Dang it, you know, I just can't catch a break on my tax preparers." Zero investigation.

And yeah, if you go to Jackson Hewitt, I imagine they might require some more documentation than the bare minimum that you need in order to go through the forms in TurboTax. Of course, we don't know exactly what information was asked in the forms in TurboTax as that's not part of the evidence that

was introduced in the last two weeks.  So we don't
know what information Mr. Mpetshi or anybody else
preparing their taxes with TurboTax was required to
put in to go through this interview process.

We also, somehow, don't know -- we know from
the outset, he says that they come in and talk to
him, provide him their information.  They all say,
no, I -- all I gave him is my ID or my social and my
W-2, and that's it.  And he didn't need anything
else.

So we know that from the outset.  And we know
that if you file taxes before, you're going to need
either your AGI or to go get a pin.  And the closets
we got is a computer expert, special agent, who had
some general knowledge that the pin site had been
hacked because of problems with the verification
that had been used with credit bureaus.  But
couldn't give us any specifics.  Still didn't know
what information would have been required in order
to file those taxes.

And in fact, he testified, of course,
because -- he didn't look at the IRS's computer, he
looked at Mr. Mpetshi's computer.  So he goes
through browser caches and the backups, window
backups of those to find, you know, copies of those

pages.  Some of them are duplicates.  What doesn't

he do?  He doesn't bring in copies of those pages to

show us what questions are being asked so we know

who's telling the truth.  We don't have that.

They say it's clear that my client knew he was

doing something against the law.  Specifically

against the law, because it's specific intent.  It's

just in tax law, ignorance is actually a defense.

They have to prove he actually knew he was breaking

the law.  It's part of the deal.  And so in order to

prove this, they're saying, "By golly, he confessed

he knew he was breaking the law."

Now, if that's clearly -- I mean first off, why

was he keeping all these records?  Second, why did

they gather all these records that he was keeping if

he knew he had been breaking the law all the time

and he had clearly confessed to it?  Third, why did

they go talk to all these other people flying an

agent back and forth from Cincinnati?

Why doesn't he always put the same amount on

the tax returns if he's the one making it up?  Why

is it just the most common amount, but not always?

Why doesn't he take the moving expense himself in

2014?

Why don't they introduce his bank records to

show that he didn't spend any money or whatever the
difference -- I mean, they know. They know that you
can count books, supplies, and equipment in addition
to what you actually paid the school. They know he
went to school in 2014. Do we know how much he
spent on books, supplies, and equipment? No.

They say perhaps the most important piece of
evidence in the Government's case is that the
defendant admitted. By golly, wouldn't it be great
if only they just recorded it or, you know, had him
write it down? Yeah, you know. And so what
happens? Sorry.

I asked Agent Goleman about if they had done
any of these things. And she answered no to the
question and we moved on. I asked Agent Amegboh
about it, he doesn't just give me a no, he says,
"That is not Internal Revenue Service policy. We do
not do that." He says, "IRS policy does not allow
special agents to record witnesses or subjects of
investigations when interviewing them."

I asked, "So you can't say, hey, you want to
give us a recorded statement?" He says, "That's
correct. We don't have the right to do that."
"Even to write down a statement?" "Well, I guess we
could do that, but that's not IRS policy. We do not

ask subjects or witnesses to write statements. We
do not have the authority to record, video, or audio
witnesses or subjects of interviews. We take
notes."

I asked about recorders. And he admits that he
has, quote, "I've heard of such a thing; yes. It's
not within IRS policy. I work for IRS criminal and
that's not authorized, so I have to follow what IRS
criminal's policies is."

And so, for the first time in his 13-year IRS
career apparently, between yesterday evening and
9:00 a.m., he learns lo and behold, IRS policy
contains all these things. But at least the custom
or the way he's been doing it in Cincinnati, they
just haven't done it, huh. We still don't know
about Springfield or what the usual practice is
there. Or, you know, if there's any practices or
traditions against recording people who are gonna
give you an admission.

We know that all the other ways to record an
interview have a way to make sure that everybody is
on the same page, understanding, a person can either
review it, sign off on it, or if there's actually,
you know, some type of actual recordings so you can
listen to what's going on, determine for yourself

how well people understand each other, but not when
you take notes."

And, for example, the report the case agent
prepared.  When the first gentleman that she spoke
with, the one that -- the last witness before the
IRS folks testified.  I'm going back.

All right.  Mr. Omalanga.  We -- now, what we
know is this:  We know that here at no point did
Mr. Omalanga testify in English; although there were
quite a few words said in French.  I determined that
he wasn't happy with me by the end.

We know that the agent's report doesn't even
mention him not being a native English speaker.
Now, whether that's because that he spoke such
perfect English there was no doubt about possible
misunderstanding and no need to go get a follow-up
when you have a French-speaking agent.  Maybe he's
just that good of an actor.

Or maybe, when you start an investigation
thinking you already know the solution, you've
already got the case solved, you just don't think to
ask those sorts of questions.

A few -- I know it's 12:05 and you're all
getting hungry, I'm going to try to keep it short.
Few things I want to talk to you about as far as the

1 | jury instructions.

2 | THE COURT: You're about 30 minutes.

3 | MR. VIG: Yes, Your Honor.

4 | I think I will be wrapped up within the next

5 | ten, if that's already.

6 | Give the evidence whatever weight you decide it

7 | deserves. There is a whole instruction, as the

8 | Judge read to you, on things you can consider in

9 | deciding the credibility of witnesses who testified.

10 | Things like intelligence, memory, demeanor, biases,

11 | reasons to lie, truthfulness in light of the other

12 | evidence, inconsistent statements.

13 | Making decisions about this testimony about

14 | defendant's statement, include defendant's personal

15 | characteristics and circumstances under which a

16 | statement may have been made.

17 | Obviously, not to beat a dead horse, but I

18 | think we're all pretty clear that he's interrogated

19 | for over an hour while his family is out there and

20 | there's nine other folks in ballistic vests and guns

21 | rummaging through his house. At the end of it did

22 | they ask him, "Hey, you know we think you violated

23 | the law; right?" No, they asked, "Do you know this

24 | is illegal." It's not a, "Do you now know this is

25 | illegal?" Or they said that the question was worded

that way.

They have to prove that he acted willfully with intent to violate the law.

Unanimity. The idea that you all agree. I like to use the example of Twelve Angry Men. It's not a great example because in that movie there's only one case. But the idea being you get back there and deliberate. If you don't all agree, then you deliberate until you do. And sometimes it's a willingness to do that that makes all the difference in the world.

And because they've -- of the way they charged it here, it's as to -- in other words, there's 30 counts, but it's really like there's 59 counts because you have to be unanimous as to whether it's line, let me see, 26 or 68. Whenever they charged both things, there has to be unanimous agreement on what's knowingly and willfully false.

They're not required to prove that the taxpayer knew the return was false. The curious thing is that's the one thing in this trial I don't think would be a hard time proving.

It's good faith instruction. So there's this idea about objective reasonableness. It doesn't have to be objectively reasonable for someone to

believe that what these people keep saying is true.
Even if you were to notice a pattern as you're going
through, doesn't have to be objectively reasonable.
All right?

So if you conclude that he's putting down what
he was told, without asking any more questions than
were required in order for him to fill out the form,
you don't have to think, "Well, that wasn't
objectively reasonable if he had made those
connections."

So as far as the elements.  The idea of
willfulness.  You know, the Government argues that,
"Well, see this chart of all these other people that
we didn't talk to that -- you know, for 2014, 2015.
And so we're going to prove that he knew he was
violating the law, that he was breaking a known
legal duty by showing that there's a number of
people that were -- had similar returns filed.  We
haven't talked to those other folks, and we can't
even prove that he showed -- that he knew he was
violating a legal duty as to these folks."  But
that's what they want you to consider it for.

I'm going to try to wrap up because I know
you're getting hungry.

You're not gonna get a definition of reasonable

doubt because we can't give it to you.  I can't,
Government can't.  Here's what I can tell you about
it, all right?  It is the highest burden we have.
There isn't a higher one.  If you think about, you
know, we heard evidence that they had probable cause
to get a search warrant; right?  That's something we
heard testimony about.  That's nowhere near what it
takes to convict and criminally punish someone.

Proof beyond a reasonable doubt is the highest
burden that we have in our law.  And it's that way
for a reason.  Because to throw the power of the
Government on someone to criminally punish them, we
want to be sure that we're right.

You know, cases like this don't lend themselves
to DNA exoneration.  This is it.  And it's for you
to determine whether the Government has proven this
case as to each and every allegation beyond a
reasonable doubt.

Let me go back to the carnival incident.  So my
wife and I, just a few weeks ago, binge-watched
Stranger Things on Netflix.  And in the third
season, there's the scene that happens at a
carnival.  Like a town fair type copy carnival,
right.

And there's this -- oh, there's this character

1  in there who's weirder than this trial was long.

2  And he's like this former investigative reporter

3  that's suspicious of the Government in every

4  possible way.  And he's with this Russian guy who's

5  walking through the carnival with him and the

6  Russian guy is super excited because he's never seen

7  these games before and he wants to play these games.

8  And the weird guy, the former reporter says:  "You

9  know, that's -- the great thing about all these is

10  the elusion of fairness.  That it appears to be

11  fair, but they're rigged, man.  They're rigged."

12  Again, you know, he's Mr. Conspiracy theory

13  extraordinary; right?

14      Now, in this particular case, there's no worry

15  that, oh, it's going to spread this guy's belief,

16  because shortly thereafter, he winds up being

17  assassinated by another Russian.  But it's one of

18  those things about TV.  They write it, it's meant to

19  bother you.  Because our country is not supposed to

20  be that way; right?

21      We think of ourselves as exhibiting actual

22  fairness for the rest of the world.  We're the

23  shining city on the hill where all men are created

24  equal.  We treat people here the way that we would

25  want to be treated if we were accused of a crime

anywhere else.  And we treat everyone the same way.

And who's best equipped to do that?  Courts.
Juries.  Why?  They don't have the same political
pressures and motivations of other branches.
They're not out there to send a message or to
execute a press release that says "Today, a central
Illinois jury returned a guilty verdict against a
man for preparing false tax returns.  The United
States Attorney and Department of Justice Tax
Division wish to thank the IRS and its dedicated
agents for their hard work over the three years of
this case."

You don't have to worry about that.  That's why
courts, juries, are the actual guarantee of
fairness.

What can you do about it?  How can you say?
Well, you can say, "Look, this isn't sufficient
beyond a reasonable doubt."  You can, in the in --
as the instruction says, give the evidence whatever
weight you decide it deserves.

One more quote from this book, then I'm done.

"There is one way in this country in which all
men are created equal.  There's one human
institution that makes a pauper the equal of
Rockefeller, the stupid man the equal of an

Einstein, the ignorant man the equal of any college
president. That institution, gentlemen, is a court.
It can be the Supreme Court of the United States or
the humblest JP Court in the land or this honorable
Court which you serve. Our courts have their
faults, as does any human institution, but in this
country, our courts are the great levelers. And in
our courts, all men are created equal."

I thank you for your time and for your
dedication over these long two weeks.

THE COURT: Thank you, Mr. Vig.

Mr. Harris.

MR. HARRIS: Thank you, Your Honor.

Ladies and gentlemen, the Government gets
another opportunity to talk to you because we have
the burden of proof, and it's a burden that we
willing share in this case.

I'm not gonna tell you stories, I'm not gonna
read from To Kill a Mockingbird. I'm going to go
back to the evidence in this case, just very
briefly, and comment on some of the remarks my
college mentioned regarding the evidence.

With regard to, first of all, the dependent
information and whether or not the credibility of
the witnesses are at stake here. It is. It is your

right to determine how much weight you want to put
into their statements.

But think about Count 1 and 2 of the indictment
which charges -- superseding indictment which
charges the defendant with making his own false tax
returns.  There's no information that he received
from any of those 16 witnesses that testified in the
case today.  Those are all his efforts, his false
moving expense, his false American Opportunity
Credit.  He didn't rely on anybody for those.

And with regard to the other 16 taxpayers and
the other counts of aiding and abetting the false
tax returns.  Basically, what he's saying is, "Look,
they provided me false information.  And therefore,
in addition to the false information that I
prepared, the tax return was extremely false.  And
therefore, somehow I am not guilty of the offense."
That's nonsense.

The evidence in this case shows that it was the
defendant who engineered those moving expenses and
opportunity credits, not the witnesses.

Now, again, all of that is sort of a
smokescreen.  A smokescreen for the defendant's own
actions --

MR. VIG:  Objection as to smokescreen.

1    THE COURT:  The objection is sustained.

2    MR. HARRIS:  What is important is what the

3    defendant did and what the defendant said.  And when

4    he was interviewed, he said "I knew I was doing

5    wrong.  I knew that these moving expenses and

6    educational expenses were false.  And I did it for a

7    reason.  I did it to increase the refund that I was

8    going to get and that the other taxpayers were going

9    to get."  You didn't hear any talk about that.

10   And the AGI, adjusted gross income.  Well, the

11   AGI is something that there wasn't any evidence of

12   what information you needed to get an AGI.  But the

13   evidence was that the defendant went to the IRS

14   transcript website several times.  That there were

15   AGI information on some of the documents that were

16   seized from his house.  It's obvious that the

17   defendant was getting AGIs, the adjusted gross

18   incomes, from somewhere in order to prepare these

19   tax returns.

20   They don't, in other words, show the

21   culpability of some of the taxpayers as providing

22   him with an adjusted gross income.

23   The witnesses that you heard testify today, I

24   doubt read -- I think the evidence shows--and this

25   is your determination whether or not they would be

1   that sophisticated to provide that kind of

2   information to the defendant.

3       And counsel asked why the defendant would keep

4   records at his house.  Well, he didn't expect the

5   IRS to knock on his door.  That was a complete

6   surprise.  That's why those records were there.

7       Why would he -- why would he put on his own

8   income tax return moving expenses if he knew it was

9   against the law?  He told you.  He told the agent.

10  The reason was to get a bigger refund.

11      And with regard to Special Agent Amegboh and

12  what he said on direct examination about or

13  cross-examination about the policy of the IRS.  He

14  was wrong.  He admitted he was wrong.  Why was he

15  wrong?  That's the policy in Cincinnati.

16          MR. VIG:  Objection, that's not the

17  testimony.  Policy.

18          MR. HARRIS:  That's how they operated.

19  That's how he was trained.

20          THE COURT:  The objection is overruled.

21          MR. HARRIS:  And he told you that.  In any

22  event, there was no connection at all from his

23  misunderstanding of the policy with any inaccuracy

24  with regarding his testimony on what the defendant

25  said when he was interviewed.  There's no evidence

1   that contradicts what the agents testified about

2   what was said during the interview.  None

3   whatsoever.

4       Ladies and gentlemen, at the conclusion of your

5   deliberation, we again ask that you find the

6   defendant guilty of all of the charges in the

7   superseding indictment.  Thank you.

8            THE COURT:  Thank you, Mr. Harris.

9       At this time, I'm going to excuse the

10  alternates.  We do have lunch for you.  Will you

11  identify the alternates for me?  Not by name -- the

12  two at the end here and this gentleman here.

13      We have a room for you to enjoy your lunch if

14  you'd like.  We would like you to stay in the event

15  we need to use you.  Leave your notes on the chair,

16  we will destroy them without looking at them.

17      If you will return to the Clerk's Office, your

18  lunch will be there.  Go ahead and get your

19  belongings out of the deliberation room, please.

20      (Alternates left the courtroom.)

21      (The Court Security Officers were sworn to

22      attend the jury.)

23           THE COURT:  If you will take the jury.

24      (The jury left the courtroom.)

25           THE COURT:  Thank you.

1       And so will you be staying, Mr. Vig?

2           MR. VIG:  Judge, I was probably going to go

3   across the street to get a sandwich, because I'm

4   awful hungry.

5           THE COURT:  So am I.  Do you have -- have

6   you given your cell to Diane?

7           MR. VIG:  I believe I already have.

8           THE COURT:  And Mr. Hansen, Mr. Harris?

9           MR. HARRIS:  Yes, we provided that.

10          THE COURT:  And what about the translators?

11          THE CLERK:  Yes, I have those as well.

12          THE COURT:  So all of you will be within

13  five minutes of the courthouse.

14      I was going to give the exhibits to the jury.

15  Any objection?

16          MR. HARRIS:  No, Your Honor.

17          THE COURT:  Mr. Vig?

18      The exhibits are right here in Diane's arms if

19  you would like to look at them.

20          MR. VIG:  Okay.  There were, aside from

21  those CDs that we discussed earlier, which aren't in

22  that stack; correct?

23          THE CLERK:  What's that, I'm sorry.

24          MR. VIG:  The CDs are not in the stack

25  because they're not going back?

1    MR. HARRIS:  They are.  But they don't have

2  a device to use them.

3    MR. VIG:  All right.  Sending back CDs

4  results in a question of, "Hey, is there something

5  we can look at these CDs with," so I would say let's

6  not send those back.

7    THE COURT:  Are the CDs in this pile?

8    MR. HARRIS:  Judge, we don't have any

9  objection to those CDs staying here instead of going

10  back.

11    THE COURT:  Diane, do you have those?

12    Okay, put them back over here.  And, Mark, will

13  you take the jury instructions, or Joe, to the jury.

14    Go ahead and take them.

15    THE CLERK:  Does the Government want to

16  look at the exhibits that are going back?

17    MR. HARRIS:  Sure.

18    (A recess was taken.)

19    THE COURT:  Bring in the jury, Joe.

20    (The jury entered the courtroom.)

21    THE COURT:  Please be seated.  Court is

22  reconvened.

23    Have you reached a verdict?

24    JUROR:  Yes, we have.

25    THE COURT:  It will you hand the jury

1   verdicts down to the first jury.

2       Jeff, if you will hand those to me, I will read

3   the verdicts.

4       Thank you, sir.

5       Number 1.  We, the jury, find the defendant,

6   West Kinioki Mpetshi, guilty of willfully making and

7   subscribing false U.S. individual tax returns.

8       Is it acceptable if I not read the rest of the

9   paragraph?

10          MR. HARRIS:  Yes.

11          THE COURT:  All right.

12      Paragraph 2.  We, the jury, find the defendant,

13  West Kinioki Mpetshi, guilty of willfully making and

14  subscribing false U.S. Individual Income Tax

15  Returns.

16      3.  We, the jury, find the defendant, West

17  Kinioki Mpetshi, guilty of willfully aiding and

18  assisting in the preparation and presentation to the

19  IRS of U.S. Individual Income Tax Returns.

20      4.  We, the jury, find West Kinioki Mpetshi,

21  guilty of willfully aiding and assisting in the

22  preparation.

23      5.  We, the jury, find the defendant, West

24  Kinioki Mpetshi, guilty of willfully aiding and

25  assisting.

1    6.  We, the jury, find the defendant, West

2  Kinioki Mpetshi, guilty of willfully aiding and

3  assisting.

4    7.  We, the jury, find the defendant, West

5  Kinioki Mpetshi, guilty of willfully aiding and

6  assisting.

7    8.  We, the jury, find the defendant, West

8  Kinioki Mpetshi, guilty of willfully aiding and

9  assisting.

10    9.  We, the jury, find the defendant, West

11  Kinioki Mpetshi, guilty of willfully aiding and

12  assisting.

13    10.  We, the jury, find the defendant, West

14  Kinioki Mpetshi, guilty of willfully aiding and

15  assisting.

16    11.  We, the jury, find the defendant, West

17  Kinioki Mpetshi guilty of willfully aiding and

18  assisting.

19    12.  We, the jury, find the defendant, West

20  Kinioki Mpetshi, guilty of willfully aiding and

21  assisting.

22    13.  We, the jury, find the defendant, West

23  Kinioki Mpetshi, guilty of willfully aiding and

24  assisting.

25    14.  We, the jury, find the defendant, West

1    Kinioki Mpetshi, guilty of willfully aiding and

2    assisting.

3         15.  We, the jury, find the defendant, West

4    Kinioki Mpetshi, guilty of willfully aiding and

5    assisting.

6         16.  We, the jury, find the defendant, West

7    Kinioki Mpetshi, guilty of willfully aiding and

8    assisting.

9         17.  We, the jury, find the defendant, West

10   Kinioki Mpetshi, guilty of willfully aiding and

11   assisting.

12        18.  We, the jury, find the defendant, West

13   Kinioki Mpetshi, guilty of willfully aiding and

14   assisting.

15        19.  We, the jury, find the defendant, West

16   Kinioki Mpetshi, guilty of willfully aiding and

17   assisting.

18        20.  We, the jury, find the defendant, West

19   Kinioki Mpetshi, guilty of willfully aiding and

20   assisting.

21        21.  We, the jury, find the defendant, West

22   Kinioki Mpetshi, guilty of willfully aiding and

23   assisting.

24        22.  We, the jury, find the defendant, West

25   Kinioki Mpetshi, guilty of willfully aiding and

1    assisting.

2        23.  We, the jury, find the defendant, West

3    Kinioki Mpetshi, guilty of willfully aiding and

4    assisting.

5        24.  We, the jury, find the defendant, West

6    Kinioki Mpetshi, guilty of willfully aiding and

7    assisting.

8        25.  We, the jury, find the defendant, West

9    Kinioki Mpetshi, guilty of willfully aiding and

10   assisting.

11       26.  We, the jury, find the defendant, West

12   Kinioki Mpetshi, guilty of willfully aiding and

13   assisting.

14       27.  We, the jury, find the defendant, West

15   Kinioki Mpetshi, guilty of willfully aiding and

16   assisting.

17       28.  We, the jury, find the defendant, West

18   Kinioki Mpetshi, guilty of willfully aiding and

19   assisting.

20       29.  We, the jury, find the defendant, West

21   Kinioki Mpetshi, guilty of willfully aiding and

22   assisting.

23       30.  We, the jury, find the defendant, West

24   Kinioki Mpetshi, guilty of willfully aiding and

25   assisting.

1    And the verdict form includes 12 signatures,

2  including the signature of our foreperson, and it is

3  dated today's date.

4    Do you wish me to pole the jury?

5        MR. HARRIS:  No, Your Honor.

6        THE COURT:  Mr. Vig?

7        MR. VIG:  Yes, please, Judge.

8        THE COURT:  We're going to start first with

9  the first row with our first jury.

10    Are these your verdicts?

11        JUROR:  Yes.

12        JUROR:  Yes.

13        JUROR:  Yes.

14        JUROR:  Yes.

15        JUROR:  Yes.

16        THE COURT:  You need to answer out loud.

17        JUROR:  Yes.

18        JUROR:  Yes.

19        JUROR:  Yes.

20        JUROR:  Yes.

21        JUROR:  Yes.

22        JUROR:  Yes.

23        JUROR:  Yes.

24        THE COURT:  Anything further, counsel?

25        MR. HARRIS:  No, Your Honor.  Thank you.

1    MR. VIG:  Thank you, Your Honor.

2    THE COURT:  Thank you.

3    I have to thank you very much for a two-week

4 time out of your lives.  I truly appreciate it, as

5 does everyone in this courtroom.  I know those

6 chairs are miserably uncomfortable.  The only thing

7 I can tell you is the pews are worse.

8    So you may talk about the case now, if you

9 wish, with the lawyers or with anyone else.  I have

10 to give a special thank you to our pregnant juror.

11 I apologize, but it had to be hard sitting here at

12 this stage.

13    Did they tell you when you will be due?

14    JUROR:  Yes.  I'm due in January, but

15 they'll probably -- my doctor's appointment, they

16 said December.

17    THE COURT:  Well, good luck --

18    JUROR:  End of December, beginning of

19 January.

20    THE COURT:  Good luck with the rest of the

21 process.

22    JUROR:  Thank you.

23    THE COURT:  Okay.  Any questions -- I can

24 come back to the jury room right now, and I will,

25 I'll follow in and see if you have any questions you

1   to ask me outside the presence of anybody else.  So

2   you are free to go.

3        And thank you very much to our alternates.

4   This is, I believe, the first time I haven't had to

5   use the alternates in this long a case.  So thank

6   you very much for being here.  We couldn't have

7   continued if we had had an absence.

8        I hope you all enjoyed your lunch.

9        (The jury left the courtroom.)

10           THE COURT:  So sentencing date is December

11  13, 1:30 p.m.  the order on implementation of

12  sentencing guidelines is entered as of this moment.

13       So, Mr. Mpetshi, you're still on bond, so you

14  still have to comply with the conditions of bond

15  that were previously set.

16       (Court was adjourned in this case.)

17

18

19

20

21

22

23

24

25

1  I, KATHY J. SULLIVAN, CSR, RPR, CRR, Official Court
2  Reporter, certify that the foregoing is a correct
3  transcript from the record of proceedings in the
4  above-entitled matter.

5

6

7

8

9              This transcript contains the
10             digital signature of:

11

12             Kathy J. Sullivan, CSR, RPR, CRR
13             License #084-002768

14

15

16

17

18

19

20

21

22

23

24

25